NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 106

No. 2015-444

| | |
|---|---|
| Charles Groves | Supreme Court |
| | |
| v. | On Appeal from<br>Superior Court, Windham Unit,<br>Family Division |
| | |
| Tasaday Green | May Term, 2016 |

Katherine A. Hayes, J.

James A. Valente of Costello, Valente & Gentry, P.C., Brattleboro, for Plaintiff-Appellant.

Jean Anne Kiewel of Jean Anne Kiewel, PC, Brattleboro, for Defendant-Appellee.

PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1. **DOOLEY, J.** Father appeals an order from the Family Division, that awarded mother sole legal and physical parental rights and responsibilities but did not award father any parent-child contact at the time. The order contained a provision permitting father to file a motion for parent-child contact, even without any change in circumstances, within forty-five days after the pending criminal charges against him had been resolved. On appeal, father contends that: (1) the court effectively terminated his parental rights without finding by clear and convincing evidence that doing so was in the best interests of the children; and (2) that the court erred in creating a prerequisite to the resumption of contact—that is, the resolution of the criminal charges—beyond his control. We affirm.

¶ 2. Father filed a parentage action on March 19, 2015. On April 8, 2015, mother filed a stipulation of parentage and a motion that she be granted sole parental rights and responsibilities

for the children and that father be denied any right to parent-child contact pursuant to 15 V.S.A. § 665(f). A hearing on the parties' parental rights and responsibilities was held on June and August 2015. Both parties were present and represented by counsel. Because of the allegations made by the mother in her motion, both parties agreed that the mother should present her evidence first, and father would present his evidence second.

¶ 3. According to the testimony of both parties, they met in the fall of 2005 and moved into an apartment together in January 2006, remaining together until February 28, 2015. Both parties stipulated that they were the biological parents of L.G., born in October 2008, and C.G., born in November 2006.

¶ 4. Mother testified that she continued in the relationship because she was physically and psychologically coerced to do so and that she felt she had "no choice." Mother testified that father repeatedly forced her to overconsume alcohol and attempted to force her to use marijuana, contrary to mother's wishes. Mother stated that she was intimidated by father's statement that he was mentally disabled and living in a halfway house. After father was forced to leave his place of residence, mother said she felt that she had to let him move into her apartment in Saratoga Springs. In testimony that the trial court characterized as credible, mother stated that father was often drunk during the first years of their acquaintance. According to mother, she repeatedly told father that she did not want a relationship with him, but he did not desist from his advances. When mother attempted to call the police, father took the phone away from her. Mother further stated that father boasted of assaulting his stepfather and of his status as a registered sex offender, which he received after having sex with a sixteen-year-old girl.

¶ 5. Mother testified that her sexual relationship with father was wholly coerced and that father physically abused her from the beginning of their relationship, with a succession of assaults occurring between November 2005 and January 2006. Mother described an instance where she ran away from father, who caught her and knocked her down in the street, resulting in

2

a large abrasion and scab. On one occasion, mother succeeded in fleeing to a friend's apartment, but did not seek help from the police. On another occasion, father reportedly dragged mother across a parking lot by her backpack. Finally, father once assaulted mother and locked her in a closet, where her screams were overheard by a neighbor who called the police. The trial court supplemented this testimony with its own observations, noting that father is physically much larger than mother, whom the court characterized as "slender and . . . frail," while describing father as "muscular and strong."

¶ 6.     Father pled guilty and was convicted of third-degree assault with intent to cause physical injury to mother on February 3, 2006. He was placed on probation for three years as a result of his conviction. C.G. was conceived at some point around the time of the conviction.

¶ 7.     Mother also outlined the high degree of control father exercised over her life: father would walk her to work every day, spend time at the Saratoga Springs Starbucks coffee shop where she worked (until barred from doing so by coffee-shop management), and meet her there after work. Father rarely left mother alone, and mother did not go to the police or tell others about her physical abuse, testifying that she felt trapped. Mother was afraid that father might injure their children, and she stayed with him to protect the children. Mother also stated that she feared that father's mother would take custody of the children, though she did not explain this sentiment. The court found that mother was the primary caregiver for the children, and had homeschooled them for their entire lives.

¶ 8.     In the spring of 2008, the parties moved to Brattleboro to be closer to mother's family. Prior to the move, mother wrote a supportive letter about father addressed to father's probation officer. Mother also met with the probation officer, because father needed the officer's permission to leave New York State. Mother stated that her letter was not truthful and that she had written it only out of a desire to move to Vermont, where she had friends and family and believed she had a better chance of exiting the relationship. After the move, father began working

3

at the Brattleboro Food Co-op, where he has worked consistently since. The court found father to be the primary breadwinner for the family since the move, noting that his earnings were put in a bank account to which mother did not have access, limiting her options for leaving the relationship. Mother also began attending classes at Greenfield Community College for the 2010 academic year, despite father's disapproval. She attended classes for approximately three hours a day for three days a week, leaving the children in father's care during this time. Mother testified that in the months before their separation, father was often too rough with C.G. when they played, hurting him when they wrestled and throwing him over his shoulder. Mother also began working as a tutor for up to 10 hours per week beginning in the spring of 2014. While not commuting, attending class, or tutoring, she spent all of her time with the children. This pattern continued until the parties separated in February 2015.

¶ 9.     Mother testified that on February 28, 2015, she was studying in her room when father attempted to coerce her into smoking marijuana. Mother resisted, and father became angry, yelling and throwing mother's books against the wall, damaging it. Mother testified that L.G. was standing nearby when this happened and could have been injured. Mother attempted to call 911, but father took the phone away from her. L.G. attempted to call from another phone downstairs, but father followed and took that phone away, throwing it down on the floor and breaking it. Mother testified that both children shouted at father to leave. Father eventually did leave, staying for several days with a friend, and then returned, after which mother and children went to stay with the children's maternal grandmother.

¶ 10.     After leaving the home, mother obtained a temporary relief-from-abuse (RFA) order against father, and the parties agreed to a "no findings" final RFA order on March 18, 2015. That order gave mother parental rights and responsibilities and barred father from having contact with the children, pending a subsequent parentage action.

¶ 11.    As a result of mother's allegations of abuse arising from the incident on February 28, father was arraigned on April 8, 2015, on charges of domestic assault and interference with emergency services.  Father was barred from having any contact with mother or children as part of the conditions of release in that criminal case.  Due to father's prior conviction for assault in New York, the first count of domestic assault was amended to a felony charge of aggravated domestic assault, second degree.  On August 24, 2015, the State filed additional charges in the same case alleging aggravated sexual assault, based on repeated, nonconsensual acts between 2011 and 2015 and a violation of an abuse prevention order on July 21, 2015.  Father was arraigned on the new charges on September 17, 2015.  At the time of the Family Division hearings in this matter, father's criminal charges were still pending with a hearing set for January 21, 2016, and conditions of relief in the RFA order remained in effect.  In order to preserve his Fifth Amendment rights in his criminal case, father ended testimony in the Family Division after hearing of the new felony charges, and his testimony was struck from the record and not considered in the Family Division's findings.

¶ 12.    According to the docket entries in the criminal case, father's criminal charges were resolved on May 12, 2016.[1]  He pled guilty to one misdemeanor count of domestic assault, one misdemeanor count of interference with access to emergency services, and one felony count of second or subsequent violation of an abuse prevention order.  The State dismissed the felony charge of aggravated, repeated sexual assault.  Father was sentenced to serve zero to twelve months all suspended on the misdemeanors and one to three years suspended for the felony and was placed on probation under standard and special conditions, with the probation warrant set to expire on May 20, 2020.

---

[1] The events recorded in this paragraph occurred after the order on appeal in this case.  We have not considered the outcome of the criminal case in resolving the issues before us.

5

¶ 13.  Photographic evidence entered in the superior court shows father, mother, and the children appearing "happy, comfortable and contented."  Mother acknowledged that over the ten years of their relationship, she had repeatedly told father that she loved him and had given him notes with loving statements, but testified that these instances were all lies told only to protect herself and the children.

¶ 14.  Neither child was in counseling at the time of the final Family Division hearing, although mother testified that she had intended to get both children into counseling after the separation.  At the time of the Family Division hearings, both children were on the waiting list for counselors at the local community mental health provider, and mother had also contacted a private therapist recommended by the children's attorney.

¶ 15.  The court began its analysis by noting that in 2014, the Legislature added subsection (f) to 15 V.S.A. § 665, which highlights the factors a court must consider in crafting a parental rights and responsibilities order.  Subsection (f) was intended to address the state's "compelling interest in not forcing a victim of sexual assault or sexual exploitation to continue an ongoing relationship with the perpetrator of the abuse" and permits a court to bar a parent from having any contact with his or her children if it finds: by clear and convincing evidence, that the child was conceived through sexual assault and by a preponderance of the evidence, that such an order is in the best interests of the child.  15 V.S.A. § 665(f)(2).  The court acknowledged mother's request that the court apply this standard to preclude father from having any contact with the children.  However, the court ultimately concluded that although mother had provided significant evidence that "most, if not all, of the sexual acts engaged in between these parties were probably non-consensual," the court was nevertheless "unable to find that [mother] ha[d] proved by clear and convincing evidence that the children were conceived as a result of sexual assault."

¶ 16.  Consequently, the court turned to the best interests of the child factors itemized by § 665(b).  The court determined that: mother is better able to meet the children's physical,

6

emotional, and developmental needs; the children are well-adjusted to their home and community; mother has been and continues to be the children's primary caregiver and; there was no evidence of other close relationships that needed to be considered. The court also found that while mother did not wish to foster a positive relationship between the children and father, her opposition was based on "legitimate concerns" stemming from father's history of alcohol and drug abuse; his physical, emotional, and sexual abuse of mother; and his violent threats in the children's presence. Accordingly, the court found that the parties could not share legal or physical rights as they were unable to communicate effectively with one another. Finally, because father was convicted of domestic assault against mother less than ten years prior to the hearing, the court considered 15 V.S.A. § 665a(a), which allows for the perpetrator of domestic violence to have parent-child contact "if the court finds that adequate provision can be made for the safety of the child and the parent who is a victim of domestic violence."

¶ 17. Recognizing that the court had "heard only [mother's] side of the history of the relationship," as father's pending felony charges meant he was unable to testify without waiving his rights against self-incrimination, the court declined to make a final, unmodifiable order. The court issued a temporary parental rights order awarding mother sole legal and physical parental rights and responsibilities with no provision for parent-child contact with father. The court's reasons for denying parent-child contact were as follows:

> [T]he court is persuaded that the existing limitations on [father's] contact with the children, barring him from all contact with them, are in the children's best interests, at least until the felony charges of aggravated domestic assault and sexual assault against [father] have been resolved. The nature of the charges themselves supports the continuation of a requirement that [father] have no contact with the children. Also, [L.G.] is an eye witness in the domestic assault case, and it would potentially create significant emotional distress for her if she were regularly communicating with [father] and also being forced to testify about his abuse in court. [C.G.] was also present in the home at the time of the domestic assault, and may be a witness. [Father] likely faces potentially long periods of incarceration and extensive programming and rehabilitation requirements if convicted of either of the felony offenses. If [father]

7

is convicted, the court concludes that it will make more sense for the children's relationship with [father] to be reestablished, if it can be, with the assistance of such programming and rehabilitation efforts, in order to improve the chances of safe, appropriate resumption of contact, after [father] has been screened and assessed, and if necessary, has accepted responsibility for his actions, and gotten substance abuse treatment and counseling about how to avoid further violence and controlling behavior. If [father] is not convicted of any criminal conduct, the court may still order him to complete counseling to protect the children, under 15 V.S.A. § 665a(b), as noted above. The court believes that although [father] and the children might benefit emotionally in the short term from reestablishing a connection now, and that it might be possible for limited, safe, supervised contact to occur through the local supervised parent-child contact program, nonetheless the risk that this relationship will be cut off by the criminal process is very significant, and the harm that would cause to the children after renewing the relationship outweighs its benefit.

We note that at the time of this decision, parent-child contact was also prohibited by the abuse prevention order and by the conditions of defendant's release imposed in the criminal case.

¶ 18.    The court order provided that within forty-five days of the resolution of his criminal charges and imposition of his sentence, father could file a motion for contact and could seek an additional hearing to demonstrate contact is in the best interests of the children. It also provided that if father did not file such a motion, he would have no right to parent-child contact except after a motion to modify and a showing of real, substantial, and unanticipated change in circumstances and that such contact would be in the best interests of the children. This appeal followed.

¶ 19.    On appeal, father raises two issues[2] for review: whether the court erred in terminating his parental rights without finding by clear and convincing evidence that the best interests of the children required termination, and whether the court erred in requiring resolution of his pending criminal charges and instituting future conditions father needed to meet in order to resume contact. We affirm.

---

[2] Father has not challenged the court order granting mother sole physical and legal rights and responsibilities for the children, and we do not consider that part of the decision and order.

¶ 20. Father relies for his first point on <u>Mullin v. Phelps</u>, in which we held that a court may not terminate parent-child contact "absent clear and convincing evidence that the best interests of the child require such action." 162 Vt. 250, 267, 647 A.2d 714, 724 (1994); see also <u>Knutsen v. Cegalis</u>, 2016 VT 2, ¶ 38 __ Vt. __, 137 A.3d 374 (same). Father argues that the court acted on allegations that he had abused mother almost ten years prior as well as a "single incident wherein he yelled, had thrown some books into a wall, then taken a phone held by his daughter and broken it" despite making no finding as to whether these allegations had been proven by clear and convincing evidence. Father contends that the record evidence of writings, photographs, and testimony from other parties showing a "healthy and constructive relationship" between father and his children was "merely discussed" in the court's findings of fact with no indication of how it was weighed in relation to mother's testimony. He maintains that the trial court disregarded evidence from his witnesses and from the guardian ad litem and attorney that supervised contact would not harm the children, that he had been a good father, and that he had been the primary caregiver for three days a week before the parties ended their relationship and provided "minimal explanation" as to why termination was in the children's best interests.

¶ 21. Father's arguments would have more force if the court order he appealed was a final order—the situation in both <u>Mullin</u> and <u>Knutsen</u>. Instead, the order was temporarily put in place, as the court explained, until the resolution of defendant's criminal case.[3] Temporary orders

---

[3] We acknowledge that the trial court described the order in question as a final order. However, because the trial court provided that the parent-child contact provision in the order could be modified without a showing of a real, substantial, and unanticipated change of circumstances up to forty-five days after resolution of the criminal charges, it was functionally a temporary order until expiration of the forty-five day period after resolution of the criminal charges. At that time, in the absence of a motion by father, and without further hearing, the order would become final. For that reason, we have determined father may appeal this case. See <u>Iannarone v. Limoggio</u>, 2011 VT 91, ¶ 17, 190 Vt. 272, 30 A.3d 655 (noting liberality of finality standard in family cases, as "we have routinely allowed appeals from the disposition of post-judgment motions in family cases", and practice is "consistent with the law from other jurisdictions," where exception to rules on appealable judgments have been recognized with regard to "ongoing family court cases" (quoting <u>Carlisle v. One (1) Boat</u>, 195 P.3d 1177, 1186 (Haw. 2008)); see also <u>Boisvert v. Harrington</u>, 173 Vt. 285, 287, 796 A.2d 1102, 1105 (2002) (addressing appeal from superior court

9

in divorce and parentage actions are specifically authorized by 15 V.S.A. § 594a.[4]  A temporary order "is designed to provide quick temporary to the parties in between the initiation of the divorce proceeding and the final decree."  Frazer v. Olson, 2015 VT 84, ¶ 16, __ Vt. __, 127 A.3d 86.

¶ 22.  Mullin established the clear and convincing evidence standard because the award of custody to the mother, with no right of parent-child contact in the father, "effectively terminated the father's parental rights."  162 Vt. at 263, 647 A.2d at 722.  Thus, we applied the due process analysis in Santosky v. Kramer, 455 U.S. 745, 747-48 (1982), where the United States Supreme Court held a state could not obtain an order terminating parental rights unless it proves by clear and convincing evidence that such termination was in the best interest of the child.  Mullin, 162 Vt. at 265-67, 647 A.2d at 723-24.  In reaching this decision, we recognized that we had held in In re A.D., 143 Vt. 432, 435-36, 467 A.2d 121, 123-24 (1983) that due process as found in Santosky did not require an elevated proof standard in child-in-need-of-care-or-supervision CHINS cases because "parental rights are only temporarily curtailed."  Id. at 265, 467 A.2d at 723.  Recently, we applied A.D. in In re B.C. in which a parent challenged the suspension of parent-child contact with a child who had been adjudicated CHINS under a statute that allowed such a suspension where necessary for the protection of the physical safety or emotional well-being of the child.  2013 VT 58, ¶¶ 16-17, 194 Vt. 391, 81 A.3d 1152.  Based on A.D., we held that this provision "clearly contemplates a temporary deprivation of rights, and therefore may be satisfied

---

order denying motion to terminate guardianship even though "there is no final judgment in the case" as Court has discretion to consider cases where "dismissal would most likely result in another appeal after remand, the merits of the question of law were fully briefed and argued, and the Court has expended valuable time on the case" (quotation omitted)); Matthews v. Riley, 162 Vt. 401, 404 n.2, 649 A.2d 231, 234 n.2 (1994) (allowing appeal from interim order rather than awaiting issuance of final order as further proceedings "would not develop controlling questions of law, further delay might prove detrimental to the child's best interest, and judicial economy would best be served by hearing the appeal").

    [4]  Section 594a applies specifically to divorce proceedings.  We have applied divorce provisions with respect to rights to children to parentage actions.  See Heffernan v. Harbeson, 2004 VT 98, ¶¶ 9-11, 177 Vt. 239, 861 A.2d 1149.

by a preponderance of the evidence showing that a suspension of contact is necessary for the protection of the child's physical or emotional safety." Id. ¶ 16. We distinguished Mullin because the suspension was temporary and did not "permanently cut off [the parent's] . . . parental rights." Id. ¶ 17. For the same reason that the holding of Mullin did not apply to B.C., it does not apply here.

¶ 23. In answer to father's second claim on appeal, we conclude that the reasons for which the court temporarily cut off father's parent-child contact fully supported the decision, including the provision delaying resolution of father's parent-child contact until after the criminal proceeding was resolved. On this point, we are applying a deferential standard of review. Because of "its unique position to assess the credibility of witnesses and weigh the evidence, we will not set aside the [family] court's findings if supported by the evidence, nor its conclusions if supported by the findings." Begins v. Begins, 168 Vt. 298, 301, 721 A.2d 469, 471 (1998) (citations omitted). Granting, modifying or denying parent-child contact lies "within the discretion of the family court, and we will not reverse the court's decision unless its discretion was exercised upon unfounded considerations or to an extent clearly unreasonable upon the facts presented." DeSantis v. Pegues, 2011 VT 114, ¶ 26, 190 Vt. 457, 35 A.3d 152 (quotation omitted).

¶ 24. The reasons given by the trial court, quoted above, supported the court's parent-child contact decision. The court could not receive a full evidentiary presentation on which to make a fully informed decision until the criminal case was resolved. We particularly note the court's concern about the interrelationship of this case and the criminal proceeding and the presence of an order from the criminal division prohibiting father from contacting mother and the children.

¶ 25. This case also raised a unique situation because of the nature of the charges against father. Under 15 V.S.A. § 665a(a), enacted in 2008, the allowance of parent-child contact to a parent may be specially regulated if "within the prior ten years" the parent is convicted of domestic

11

assault or aggravated domestic assault against the other parent or found to have committed abuse against a family or household member if "adequate provision can be made for the safety of the child and the parent who is a victim of abuse." Seven specific conditions are authorized including ordering the perpetrator of domestic violence to participate in a program for perpetrators or other counseling as a condition of visitation; ordering where drugs or alcohol are involved in the abuse the perpetrator not to be under the influence during the visitation or during the preceding 24 hours; and imposing any other condition appropriate to provide for the safety of the child, the victim of domestic violence, or another family or household member. Id. §§ 665a(b)(3),(4) & (6). The statute would apply if father was convicted of the charges against him.[5] The trial court was rightly concerned that the application of the statute would change the nature and content of any parent-child contact order and would not be known until the criminal case reached its conclusion.

¶ 26. In affirming the temporary order despite the absence of a right for father to have parent-child contact, we recognize that this is not the only way the court might have proceeded to protect father's right of self-incrimination in the criminal case but obtain the needed evidence to fully resolve the parentage proceeding. Father could have sought Begins immunity. In State v. Begins, we held that when a defendant is charged with misconduct that constitutes the basis for both revocation of probation and an independent criminal charge, a trial court has two options. 147 Vt. 295, 514 A.2d 719 (1986). The court can either continue the probation hearing until after

---

[5] The court found that the statute applied at the time of its decision because the 2006 New York assault conviction was a "domestic assault" conviction under § 665a(a) and occurred within ten years of the decision. We infer from the court's observations about restrictive conditions in a final parent-child contact order after the resolution of the criminal case that the court believed that § 665a(a) was unlikely to apply because the passage of time put the New York conviction beyond the ten-year trigger from the date of the final order. There is an open question whether the statute applied as a result of the abuse prevention order because the order made no finding of abuse instead providing that "findings waived by stipulation of the parties."

The parties have not briefed or argued the interpretation of § 665a in this case. Thus, we accept for purposes of this opinion the implied conclusion that the statute would apply to the final parent-child contact order only if father were convicted of domestic assault from the charges pending against him.

the trial, or if it must hold the hearing before the trial, thereby forcing a defendant to choose between testifying at the hearing and remaining silent so as to avoid self-incrimination, a defendant's testimony at the revocation hearing will be "subject to an exclusionary rule" modeled on the federal use and fruits immunity rule. Id. at 299, 514 A.2d at 722; see Kastigar v. United States, 406 U.S. 441, 462 (1972) (requiring grant of amnesty where government "coerces a defendant into incriminating himself"). Begins thus provides that when a witness in a proceeding asserts his or her Fifth Amendment privilege, the witness may be compelled to testify but "will be protected by use and fruits immunity"; to that end, the State "may not use such testimony as a springboard to a future criminal proceeding" and the witness "may object to the introduction of any evidence taken or derived from his or her testimony." In re Hill, 149 Vt. 431, 439-40, 545 A.2d 1019, 1025 (1988). We have since applied Begins at sentencing hearings to admissions of uncharged crimes and acknowledgements of culpability when mandated as a condition of a probation. See State v. Drake, 150 Vt. 235, 237, 552 A.2d 780, 781 (1988) (uncharged crimes); State v. Loveland, 165 Vt. 418, 427, 684 A.2d 272, 278 (1996) (sex offender acknowledgements of culpability).

¶ 27. While we have never explicitly extended Begins to testimony proffered in family division proceedings, such a procedure could be well-suited to cases like the present one. As in Begins, and the subsequent cases, the State's ability to use father's testimony in the family division created an "inevitable tension" between two fundamental rights: the right to remain silent at trial and the right to contact with one's child. Begins, 147 Vt. at 298, 514 A.2d at 722; see Santosky, 455 U.S. at 753 (noting that natural parents have a "fundamental liberty interest" in custody of their children). A lesser burden of proof is required by family courts to revoke or limit parental rights. Moreover, we believe that the first solution proposed in Begins—that of postponing the non-criminal hearing until the criminal trial—is undesirable for family proceedings involving parental rights and responsibilities and parent-child contact, as we favor the resolution of custody

13

cases as quickly as possible in order to provide children with stability and security. See, e.g., J.D.S. v. Franks, 893 P.2d 732, 735 (Ariz. 1995) (noting "need for a quick resolution" in cases involving custody and placement of young children). Similarly, a family proceedings judicial system wherein parents are afraid to testify out of fear of criminal charges will preclude courts from gathering the evidence necessary to make informed child custody determinations.

¶ 28. In affirming the order here, we recognize that immunity is not an acceptable answer in all cases. For reasons discussed above, the court found it important to know the resolution of the criminal case in crafting a final order with respect to parent-child contact so the issuance of a temporary order, to be followed by a permanent order after the criminal case was resolved was appropriate. While Begins immunity might have allowed for more evidence in this proceeding, it may have had no effect on the outcome given the presence of the no-contact order from the criminal division and concerns about the children as witnesses. Thus, while use immunity may be a tool for a parent or the court, we see it only as an option to be considered, not a requirement.

¶ 29. We find no error in requiring father to make a separate motion for parent-child contact and discussing some of the provisions that may be in a parent-child contact order if such contact were authorized after the resolution of the criminal case. Because father had the information to determine that the criminal case was resolved, and the consequences of that resolution, it was reasonable for him to have the burden of filing a motion to bring parent-child contact again before the court. In seeking a permanent order on parent-child contact, he did not have to show a change of circumstances and was not bound by the findings that supported the temporary order.[6] Frazer, 2015 VT 84, ¶ 16.

---

[6] We recognize that if father did nothing at the conclusion of the criminal case the temporary order denying parent-child contact would become permanent even though there was no finding by clear and convincing evidence that the denial of such contact was in the best interest of the children. This would, however, be equivalent to the situation where he never sought parent-child contact at all. If his failure to seek parent-child contact was as a result of a prohibition of such contact in his sentence in the criminal case, he would have grounds to show change of circumstances once the legal prohibition expired.

¶ 30.   Nor do we find error in the court's observations on what may be included in a parent-child contact order depending upon whether father was convicted of the charges against him.   As we stated in DeSantis, 2011 VT 114, ¶ 38, "the passage of time without any contact, coupled with the allegations of abuse and the effect such allegations had on [a child's] wellbeing, required the court to reexamine what level of parent-child contact would most benefit [the child]." We view the court's words as observations rather than a binding future order.   The observations noted that if father was convicted, parent-child contact could be restricted "to improve the chances of a safe, appropriate resumption of contact" and suggested some of the possible restrictions consistent with 15 V.S.A. § 665a.   They also noted the court's power even if father was not convicted.  These observations were made without knowledge of the evidence and circumstances that would be before it at a hearing on the final order with respect to parent-child contact.  We do not view the observations as binding the court to any parent-child contact order, including binding it to allowing parent-child contact, based on the evidence and arguments at the final hearing, and the findings based on the evidence and findings.   Nor do we view the court's observations as restricting the evidence either party could present, or the arguments they could make, at the hearing.

Affirmed.

FOR THE COURT:

_____
Associate Justice