VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org



Case No.      23-AP-030

*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant.  Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

JULY TERM,   2023

Amy Wetzel v. Daniel Zimmer\*

}  APPEALED FROM:
}
}  Superior Court, Windham Unit,
}  Family Division
}  CASE NO. 57-3-18 Wmdm
Trial Judge: Katherine A. Hayes

In the above-entitled cause, the Clerk will enter:

Father appeals from the trial court's award of parental rights and responsibilities (PRR) to mother and the court's temporary order regarding parent-child contact (PCC).  We do not reach the merits of the temporary PCC order given its interlocutory nature.  We affirm the court's PRR decision.

The parties are parents of a son born in July 2011.  Mother initiated divorce proceedings in March 2018.  The parties initially agreed to share PRR and stipulated to a PCC schedule pending resolution of their divorce.  In February 2019, however, mother filed an emergency relief-from-abuse (RFA) petition against father and an emergency motion to modify PRR.  Mother's request for a final RFA order was denied in March 2019.  While the RFA court credited mother's claims that father repeatedly physically abused her between 2014 and 2017 in son's presence, it found no danger of further abuse given the parties' separation.

In March 2019, father was charged with first-degree aggravated domestic assault and domestic assault based on acts allegedly committed against mother in late 2017 and early 2018.  Under his original conditions of release, father was barred from having any contact with mother or son.  In August 2020, the conditions were modified to allow father to have supervised PCC with son if allowed by the family division.  In the interim, however, father was charged with two counts of violating his conditions of release by having contact with mother and son.

In October 2020, the court allowed father to have supervised PCC through the Winston-Prouty Child and Family Center.  Father subsequently requested the appointment of a parent-

coordinator, alleging that no supervised visitation had occurred. The court appointed a parent-coordinator who filed several reports and recommendations with the court. Father agreed with the parent-coordinator's initial recommendations but did not agree to some of her later recommendations, including working with a therapy group called the Children and Parents Project (CPP).

The parties stipulated to the division of their marital property and the court scheduled a full-day hearing solely on PRR and PCC. It granted father use immunity for any testimony he would offer relevant to the criminal charges referenced above. The court subsequently learned that father faced another pending charge for violating his conditions of release in November 2021 by allegedly contacting mother, which was not covered by the court's prior grant of immunity.

In January 2022, the parent-coordinator filed her final report and stated that parent-coordination must be terminated. Following a hearing, the court issued a December 2022 order regarding PRR and PCC. It made numerous findings, including the following. At the time of the court's decision, son was eleven years old. He was doing very well at school. Mother was living with a new partner as was father. Mother credibly testified that father physically abused her repeatedly during their marriage, including in son's presence. The court recounted various acts of physical abuse. It also described father punching holes in the walls, throwing things, yelling, and kicking the family dog during arguments or outbursts. It credited mother's testimony that father drank alcohol, typically wine or beer, daily and to excess, during almost the entirety of the marriage.

Father did not testify about any of the charged instances of abuse or violations of conditions of relief despite the grant of immunity. Father admitted that he is large and loud-mouthed, which is common in his family. Father admitted that he had a history of alcohol abuse and that, during the marriage, there were times when his conduct was affected by his use of alcohol. The court found that father credibly testified that he had largely quit drinking. Father believed that mother was alienating son from him and that there was no legitimate basis for son to fear him or refuse contact with him. On multiple occasions, son threated to harm himself if he had to visit father. Father blamed mother for son's threats and his refusal to visit father. The court found it clear that father loved son very much and was hurt by their lost relationship.

Son was seen by a mental-health clinician in February 2019. Son reported being terrified of father. He expressed fear that father would hurt him or mother, and he was suffering from sleep disturbances due to these fears. The clinician diagnosed son with anxiety and recommended that he continue with psychotherapy. Son refused to engage in visitation with father and mother followed up at the emergency room in March 2019 after son again threatened self-harm if he had to visit father. An emergency room doctor concluded that son was not mentally ill and that he reasonably feared father given father's verbal abuse of son and physical abuse of mother. Son's school reported that son was anxious and stressed.

The court found that, despite mother's testimony about father's history of abuse, mother supported son having a positive relationship with father and she believed that this would be in his best interests. Mother had never knowingly said anything negative about father in front of son

and never told son that father was dangerous. The court made extensive findings about the testimony provided by the parent-coordinator, whom it found highly qualified. The parent-coordinator testified that son consistently stated, with or without mother present, that he wanted no contact with father. The parent-coordinator believed that mother genuinely supported a gradual increase in supervised PCC.

Son's therapist stopped working with him in early September 2021 for personal reasons unrelated to this case and son had not resumed therapy since that time. The parent-coordinator testified that she tried to find a therapist who could work with the family. CPP was available but it required both parents' cooperation. While mother wanted to work with CPP, father did not.

Based on these and numerous other findings, the court evaluated the statutory best-interest factors in determining how to allocate PRR. The court awarded mother sole legal and physical PRR for son, subject to father's right to appropriate, safe PCC. It found that mother loved and cared for son and could meet his needs. She was also committed to assisting son in reestablishing a positive and healthy relationship with father. The court noted that the parent-coordinator worked diligently, but fruitlessly, with parents and son to facilitate son's resumption of a normal relationship with father. Her efforts resulted in some very limited contact. Her testimony and reports convinced the court that son had chosen, by himself, not to have contact with father and his resistance was not caused by or encouraged by mother's conduct. Father's history of abuse was a factor in son's decision. While the court believed that son could have safe in-person contact with father, son did not believe so. The court, like mother, was unprepared to order son to attend in-person visits until he could do so without feeling significant fear of physical harm.

The court believed it would be in son's best interests to work with CPP but it could not require father to agree. If CPP was not available, son needed to work with an individual therapist. The court also ordered father to engage in anger-management counseling before he could have any in-person contact with son and to refrain from alcohol use twelve hours before in-person contact with son and during such contact. The court authorized father to send letters, cards, and gifts to son. Until father's pending criminal charges were resolved, the court prohibited father from telephone or in-person contact with son unless son explicitly consented or requested such contact. Once father's criminal charges were fully resolved, if father was in the community and not subject to correctional supervision inconsistent with such an order, the court stated that it would require parents to reengage with the Winston Prouty Child and Family Center's supervised PCC program. The court understood that under the program's policies, son would not be required to participate in any visit with father if he declined to do so. Nonetheless, it had been two years since such visits were attempted and son had grown and become more mature since then. The court hoped that son was willing to reconsider his refusal to engage in supervised visits with father.

The court agreed with the parties that, at this point, a final PCC schedule or plan could not be issued. It expressed hope that, with appropriate therapeutic supports, son would soon be willing to gradually resume PCC. At some point, the parties might want to engage in formal reunification therapy, but that process should not begin until son established a solid relationship with an individual therapist, father's criminal charges were resolved, and father had completed

anger-management therapy.  The court ordered the case set for a status conference three months after father's criminal charges were fully resolved to monitor progress and determine if an additional evidentiary hearing was needed to enable the court to issue a final PCC plan and schedule.  This appeal followed.

Father first asserts that the temporary PCC order is functionally a final order and therefore subject to appeal.  He contends that the court's order effectively terminates his contact with son indefinitely.  Alternatively, he asks the Court to suspend the rules and consider this appeal.  He states that he has not had PCC for over four years and that there is no more time to be lost.

As father recognizes, a final order is generally a prerequisite to jurisdiction and "[t]here are weighty considerations that support the finality requirement."  In re Pyramid Co. of Burlington, 141 Vt. 294, 300 (1982) (recognizing that "[p]iecemeal appellate review causes unnecessary delay and expense, and wastes scarce judicial resources").  "[A]n appellate court labors under great disadvantages in disposing of interlocutory appeals," and "[b]y [their] very nature . . . , interlocutory appeals impair this Court's basic functions of correctly interpreting the law and providing justice for all litigants."  Id. at 300-301.  "We have noted [that] there is no area of the law requiring more finality and stability than family law."  Iannarone v. Limoggio, 2011 VT 91, ¶ 17, 190 Vt. 272 (quotation and alteration omitted).

We reject father's assertion that the court's PCC ruling is effectively a final order.  The trial court explicitly stated otherwise in its decision.  The court explained, moreover, that its decision to issue a temporary order was consistent with the parties' position below.  The court did not terminate father's contact with son indefinitely.  Its order is temporary and allows father to contact son in writing.  The court restricted telephone and in-person contact only until father's pending criminal charges are fully resolved.  Once that occurs, the court will hold a status conference in anticipation of issuing a final order.  The order here is plainly interlocutory in nature.

Our decision in Groves v. Green, 2016 VT 106, 203 Vt. 168, does not compel a contrary conclusion.  In that case, the trial court similarly considered PCC for a father charged with domestic assault.  The father there was prohibited by an abuse-prevention order and by his conditions of release from having PCC.  The trial court ordered that, following "the resolution of [the father's] criminal charges and imposition of his sentence, he could file a motion for contact" and seek a hearing to show that contact was in the children's best interests.  Id. ¶ 18.  If the father did not file such a motion, no PCC would occur unless father moved to modify and showed both changed circumstances and that such contact was in the children's best interests.

The father argued on appeal that his parental rights had been effectively terminated and that the court erred in imposing the conditions above on his ability to resume contact.  At the outset, we recognized that the father was appealing a temporary order, not a final one.  We thus rejected the argument that his parental rights had been "permanently cut off."  Id. ¶ 22.  The trial court indicated in Groves that "in the absence of a motion by [the] father, and without further hearing, [its] order would become final."  Id. ¶ 21 n.3.  "For that reason," we allowed the father to appeal.  Id.  We further held that "the reasons for which the court temporarily cut off [the]

4

father's parent-child contact fully supported the decision, including the provision delaying resolution of [the] father's parent-child contact until after the criminal proceeding was resolved." Id. ¶ 23.

In this instant case, the trial court indicated that it will hold a status conference upon the resolution of father's criminal charges and determine at that point what progress has been made and whether an additional evidentiary hearing is required. It temporarily restricted in-person contact after determining that this promoted son's best interests; it expressed hope that son might agree to supervised contact. The court did not provide a trigger for the issuance of a final order as in Groves and we distinguish Groves on this basis. We further decline to suspend the rules under Vermont Rule of Appellate Procedure 2 to consider the court's interlocutory ruling given the "weighty considerations" in favor of reviewing final decisions. Pyramid Co. of Burlington, 141 Vt. at 300. There is much that remains unsettled in this case, and it would be premature for this Court to address the merits of this temporary decision.

We thus turn to father's remaining argument. Father argues that the court abused its discretion in declining to award him legal rights to medical and mental-health decisionmaking. He asserts that the court should have found that mother engaged in parental alienation and that she was not committed to assisting son in reestablishing a positive and healthy relationship with him. He cites evidence that he believes supports his position.

"The family court has broad discretion in determining what allocation of parental rights and responsibilities is in a child's best interests." LeBlanc v. LeBlanc, 2014 VT 65, ¶ 21, 197 Vt. 17. By law, "[w]hen the parents cannot agree to divide or share parental rights and responsibilities, the court shall award parental rights and responsibilities primarily or solely to one parent." 15 V.S.A. § 665(a). The trial court found this particularly true given the abuse that occurred during the parties' marriage. In reaching its conclusion as to PRR, the court must consider a child's best interests, including factors set forth by statute. Id. § 665(b).

As an initial matter, the court could not, by law, have divided PRR as father now requests. The court applied the appropriate standard, and its decision is supported by its findings and the evidence. In allocating PRR, the court appropriately looked to the statutory best-interest factors; it did not need to find by clear and convincing evidence that son would be at "significant risk of mental health problems if efforts at reunification" occurred, as father asserts. Cf. Knutsen v. Cegalis, 2016 VT 2, ¶ 31, 201 Vt. 38 (recognizing trial court's discretion in awarding custody and determining PCC, and concluding that trial court's decision was supported by evidence where court "credited expert testimony that the child would be at significant risk of mental health problems if efforts at reunification with mother continued"). Among numerous other findings, the court rejected father's assertion that mother engaged in parental alienation. It found that mother supported father having a positive, loving, and appropriate relationship with father. Father, on the other hand, remained very hostile toward mother and he showed no insight into his own abusive conduct and its impact on son. The court found that father could not be relied upon to keep son safe from such conduct in the future. "As the trier of fact, it [is] the province of the trial court to determine the credibility of the witnesses and weigh the persuasiveness of the

5

evidence." Cabot v. Cabot, 166 Vt. 485, 497 (1997).  We do not reweigh the evidence on appeal. While father disagrees with the court's conclusions, he fails to show any abuse of discretion. See, e.g., Meyncke v. Meyncke, 2009 VT 84, ¶ 15, 186 Vt. 571 (mem.) (explaining that arguments which amount to nothing more than disagreement with court's reasoning and conclusion do not make out case for abuse of discretion).  The court's decision "reflects its reasoned judgment in light of the record evidence," Kasper v. Kasper, 2007 VT 2, ¶ 5, 181 Vt. 562 (mem.), and there was no error.

Affirmed.

BY THE COURT:

Paul L. Reiber, Chief Justice

Harold E. Eaton, Jr., Associate Justice

William D. Cohen, Associate Justice