NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2025 VT 36

Nos. 24-AP-403 & 25-AP-022

| | |
|---|---|
| Office of the Auditor of Accounts et al. | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Washington Unit, |
| | Civil Division |
| | |
| Office of the Attorney General et al. | May Term, 2025 |

Timothy B. Tomasi, J.

Matthew B. Byrne of Gravel & Shea PC, Burlington, for Plaintiffs-Appellants/Cross-Appellees.

Charity R. Clark, Attorney General, Jonathan T. Rose, Solicitor General, and Sarah E.B. London, Chief Assistant Attorney General, Montpelier, for Defendants-Appellees/Cross-Appellants.


PRESENT: Reiber, C.J., Eaton, Carroll, Cohen and Waples, JJ.


¶ 1.    **WAPLES, J.**  This appeal calls us to settle an unusual dispute between Vermont's Auditor of Accounts and Attorney General, two statewide elected officials. The Auditor sued the Attorney General, alleging that she has failed to comply with her statutory obligation to provide legal advice. The Auditor seeks a declaratory judgment that he has the right to retain counsel to sue the Attorney General and that the Attorney General must advise the Auditor on questions of law pursuant to statute. Finally, he seeks a writ of mandamus to compel the Attorney General to answer two specific questions the Auditor posed. The trial court dismissed the Auditor's claims and denied his request for attorneys' fees. We affirm in part and reverse in part.

¶ 2.    This case developed from the Auditor's work auditing a Burlington tax increment financing (TIF) district. While conducting the audit, the Auditor confronted a perceived gap in applicable TIF statutes and regulations and sought advice from the Attorney General. The dispute before us revolves around the Auditor's questions and the Attorney General's response. The

Auditor posed three questions to the Attorney General. In response, the Attorney General answered one question directly. She did not answer the other two questions as posed, but instead explained which entities had the statutory authority to give the Auditor a binding answer to the unsettled questions of law.

¶ 3.  The Auditor then asserted that the Attorney General was violating her obligation under 3 V.S.A. § 159 to provide legal advice regarding the two questions. That statute[1] provides, in full:

> The Attorney General shall advise the elective and appointive State officers on questions of law relating to their official duties and shall furnish a written opinion on such matters, when so requested. He or she shall have general supervision of matters and actions in favor of the State and of those instituted by or against State officers wherein interests of the State are involved and may settle such matters and actions as the interests of the State require.

3 V.S.A. § 159. Based on that purported violation of statute, the Auditor threatened to sue the Attorney General. The Attorney General responded with a letter explaining the statutes governing the provision of legal advice for the administration of TIF districts and stated that her responses constituted legal advice. She suggested that the Auditor was not accepting legal advice with which he disagreed. The Attorney General also asserted that the Auditor lacked the authority to sue her or the State.

¶ 4.  This suit followed. Douglas Hoffer, in both his official capacity as Vermont's Auditor of Accounts (the Auditor) and his individual capacity, sued Charity Clark in her official capacity as Vermont's Attorney General and the Attorney General's Office (together, the Attorney General). The Auditor and Hoffer, together, asserted three claims in the suit. First, they sought a writ of mandamus to compel the Attorney General to provide legal advice to the Auditor in accord

---

[1]  The Legislature made minor, immaterial changes to this statute in 2025. See 2025, No. 18, § 6 (changing "He or she" to "The Attorney General;" "wherein" to "where;" and inserting subheadings). All references to this statute in this opinion are to the prior version, operative at the time of the dispute between the Auditor and the Attorney General, but the changes to the statute do not change our analysis here.

2

with 3 V.S.A. § 159.  Second, they sought a declaratory judgment to clarify the Attorney General's duties under that statute.  Finally, they sought a declaratory judgment that the Auditor has a constitutional right to retain counsel to bring this action.

¶ 5.    The Attorney General moved to dismiss.  After a hearing, the trial court dismissed each count in the suit.  The trial court dismissed Hoffer in his individual capacity as a plaintiff for lack of standing.  It dismissed the Auditor's mandamus request for failure to state a claim upon which relief could be granted because it concluded that mandamus was not available where the Attorney General met her obligation to provide some legal opinion on the question presented.  See V.R.C.P. 12(b)(6).  For the same reason, it dismissed the Auditor's request for declaratory judgment as to the scope of 3 V.S.A. § 159.  Finally, the trial court dismissed as moot the Auditor's request for a declaratory judgment on his right to retain counsel and sue.  Because the Auditor retained counsel and was suing the Attorney General in the instant suit, the court concluded there was no live controversy as to that issue.  See V.R.C.P. 12(b)(1).

¶ 6.    After the trial court ruled, the Auditor filed a request for attorneys' fees under Vermont Rule of Civil Procedure 54.  The trial court concluded that Rule 54 did not allow the relief sought and denied the motion. The Auditor[2] filed separate appeals from the dismissal of his claims and from the order denying attorneys' fees.  We consolidated the two appeals for review. V.R.A.P. 3(c)(2).

## I.  Standard of Review

¶ 7.    The trial court dismissed the Auditor's claims under Vermont Rules of Civil Procedure 12(b)(1) and 12(b)(6). We review decisions on Rule 12(b)(1) and Rule 12(b)(6) motions to dismiss de novo and will uphold dismissal "only if it is beyond doubt that there exist no facts or

---

[2] Hoffer appears to have joined this appeal in his individual capacity.  However, he did not appeal the trial court's ruling that he lacks standing to join in the claims he makes in his official capacity as Auditor.  Any argument that this was error is thus waived.  Rowe v. Brown, 157 Vt. 373, 379, 599 A.2d 333, 337 (1991). The Auditor, in his official capacity, is accordingly the only plaintiff whose claims we consider here.

3

circumstances that would entitle the plaintiff to relief." Rodrigue v. Illuzzi, 2022 VT 9, ¶ 30, 216 Vt. 308, 278 A.3d 980 (quotation omitted); Wool v. Off. of Pro. Regul., 2020 VT 44, ¶ 8, 212 Vt. 305, 236 A.3d 1250. Under both rules, we "assume as true the nonmoving party's factual allegations and accept all reasonable inferences that may be drawn from those facts." Wool, 2020 VT 44, ¶ 8 (quotation omitted). We also "assume that all contravening assertions in defendant's pleadings are false." Mahoney v. Tara, LLC, 2011 VT 3, ¶ 7, 189 Vt. 557, 15 A.3d 122 (mem.) (alteration and quotation omitted).

¶ 8. However, when a complaint relies "upon outside documents, those documents merge into the pleadings and the court may properly consider them under a Rule 12(b)(6) motion to dismiss." Davis v. Am. Legion, Dep't of Vt., 2014 VT 134, ¶ 13, 198 Vt. 204, 114 A.3d 99 (alterations and quotation omitted). If "a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." Id. (quotation omitted). Additionally, a trial court "may consider evidence outside the pleadings in resolving a motion to dismiss for lack of subject matter jurisdiction [under Rule 12(b)(1)], and we review these factual findings for clear error." Conley v. Crisafulli, 2010 VT 38, ¶ 3, 188 Vt. 11, 999 A.2d 677.

## II. Auditor's Authority to Retain Counsel and Sue

¶ 9. The Auditor seeks a declaratory judgment that he has the right to retain counsel and sue the Attorney General. The trial court dismissed this claim as moot because the Auditor hired outside counsel to litigate this case, and the Attorney General did not take over representation of the case and dismiss it[3] under Civil Rule 41 and 3 V.S.A. § 159. See 3 V.S.A. § 159 (providing Attorney General "shall have general supervision of matters and actions . . . instituted by or against State officers . . . and may settle such matters and actions as the interests of the State require").

---

[3] In her motion to dismiss below, the Attorney General argued that she would be remiss in her duties if she "did not seek dismissal of unsanctioned litigation against the State and its officers," citing her obligations under 3 V.S.A. § 159 to supervise "matters and actions . . . instituted by or against State officers." Though this argument is not squarely before us here and we do not address it further, we have doubts about the authority of the Attorney General to unilaterally dismiss claims against herself.

4

¶ 10. We must first confront whether the trial court properly dismissed this claim as moot. Vermont courts only have subject-matter jurisdiction over "actual cases or controversies." Ferry v. City of Montpelier, 2023 VT 4, ¶ 11, 217 Vt. 450, 296 A.3d 749 (quotation omitted); see also In re Constitutionality of House Bill 88, 115 Vt. 524, 529, 64 A.2d 169, 172 (1949). To respect the proper role of courts among the three branches of government, we "must exercise judicial restraint by not asserting jurisdiction over claims that are moot." Brigham v. State, 2005 VT 105, ¶ 9, 179 Vt. 525, 889 A.2d 715 (mem.). A "case or a claim becomes moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." State v. J.S., 174 Vt. 619, 620, 817 A.2d 53, 55 (2002). "Stated another way, a case becomes moot when this Court can no longer grant effective relief." Paige v. State, 2017 VT 54, ¶ 7, 205 Vt. 287, 171 A.3d 1011 (quotation omitted). We may consider occurrences outside of the pleadings to evaluate whether a case presents an actual controversy. See McCormack v. Scott, 2025 VT 7, ¶¶ 5, 13, __ Vt. __, 331 A.3d 1150 (explaining Governor's actions during pendency of appeal rendered appeal moot).

¶ 11. Our mootness analysis does not change because this is a claim for declaratory judgment. Claims for declaratory judgment under the Declaratory Judgments Act, 12 V.S.A. §§ 4711-4725, do not "enlarge a court's subject matter jurisdiction," and a court may only provide a declaratory judgment if there is "an actual—not merely theoretical—controversy." Burlington Sch. Dist. v. Provost, 2019 VT 87, ¶ 14, 211 Vt. 277, 224 A.3d 841. "The function of a declaratory judgment is to provide a declaration of rights, status, and other legal relations of parties to an actual or justiciable controversy." Robtoy v. City of St. Albans, 132 Vt. 503, 504, 321 A.2d 45, 46 (1974).

¶ 12. This claim is not moot. Though the Auditor has retained counsel and sued here, there is a live dispute between the parties over whether that retention was proper and whether and how the Auditor may pay his attorney, a necessary component of the authority to retain counsel. Our determination of this question about the Auditor's authority to retain counsel and sue will

5

either resolve or substantially inform the ongoing out-of-court dispute between the Auditor and the Attorney General over payment to the Auditor's counsel. Because "we could still grant effective relief" to the Auditor, his claim is not moot. Wool, 2020 VT 44, ¶ 7.

¶ 13. Typically, after we hold that a trial court had jurisdiction to hear a claim for which the trial court determined it did not have jurisdiction, we remand the matter back to the trial court to make a ruling on the merits. See Columb v. Columb, 161 Vt. 103, 113, 633 A.2d 689, 694 (1993); In re Kirkpatrick, 147 Vt. 637, 638, 523 A.2d 1251, 1251 (1987). However, the trial court here already indicated how it would rule on the merits. The court concluded that "[i]f it were to reach the question," this Court's decision in "OneCare [would remain] an immoveable impediment to the Auditor's position." See Vt. State Auditor v. OneCare Accountable Care Org., LLC, 2022 VT 29, ¶ 18, 216 Vt. 478, 280 A.3d 377.

¶ 14. Both parties have extensively briefed the claim at issue and no further factual development appears to be necessary. Thus, in the interests of resolving this matter and avoiding a further appeal, we proceed to the merits and decide whether the Auditor has the right to retain counsel and sue. Compare In re R.W., 2011 VT 124, ¶¶ 48-54, 191 Vt. 108, 39 A.3d 682 (concluding remand was necessary in light of lack of factual record developed after trial court determined it lacked jurisdiction), with Groves v. Green, 2016 VT 106, ¶ 21 n.3, 203 Vt. 168, 154 A.3d 507 (recognizing court has discretion to consider matters where " 'dismissal would most likely result in another appeal after remand, the merits of the question of law were fully briefed and argued, and the Court has expended valuable time on the case' " (quoting Boisvert v. Harrington, 173 Vt. 285, 287, 796 A.2d 1102, 1105 (2002)).

A. Inherent Constitutional Authority

¶ 15. The Auditor argues that we should overturn OneCare and announce that the Auditor has inherent powers, such as the right to retain counsel and sue, arising from his status as a constitutional officer. In OneCare, the Auditor sued OneCare Accountable Care Organization, LLC, alleging that OneCare had breached various provisions in its contract with the Department

6

of Vermont Health Access by denying the Auditor's requests for OneCare's employee payroll and benefits records. 2022 VT 29, ¶ 1. The trial court dismissed the suit, concluding that the Auditor lacked authority to demand the records. We affirmed, explaining that "[l]ike other executive officials and agencies, the Auditor possesses only that authority which the Legislature has granted," and because there was no statute authorizing his review of the records at issue, he was without authority to demand them. Id. ¶¶ 18, 20-22 (quotation omitted).

¶ 16. The Auditor contends this decision was erroneous because he has a constitutional power[4] to audit and has no need for legislative authorization. He points to the history of the role of the Office of the Auditor, the text and structure of the Vermont Constitution, various economic and sociological factors, and our past precedent to support his position. See State v. Jewett, 146 Vt. 221, 227, 500 A.2d 233, 237 (1985) (suggesting these factors would be relevant to interpreting state Constitution). For the reasons that follow, we are unpersuaded that the Constitution sets forth a system in which the Auditor has inherent powers unmoored from legislative authorization. We have held throughout Vermont's history that the Auditor only has the powers given to him by statute. See OneCare, 2022 VT 29, ¶ 18; State v. Howard, 83 Vt. 6, 17, 74 A. 392, 396 (1909) ("[T]he powers of an auditor are determined by statutory provisions."); Grout v. Gates, 97 Vt. 434, 450, 124 A. 76, 81 (1924) (same). We hold the same here today.

i. History

¶ 17. To support his claim that he has broad inherent constitutional powers to "audit," the Auditor relies on the provision of the Vermont Constitution stating that "[t]he Treasurer's

---

[4] The Auditor argues that the Attorney General waived her arguments related to the Auditor's constitutional powers because it did not raise them below. The Auditor is incorrect. The Attorney General raised the argument that the Auditor's powers are confined by statute in her motion to dismiss and thus properly preserved the issue for our review. Moreover, an appellee has the right to argue that the trial court's decision was correct on any ground supported by the record, even one that was not relied upon below. 5 Am. Jur. 2d Appellate Review § 718 (2025) ("An appellate court is not limited, in affirming a judgment, to grounds raised by the parties, or grounds relied upon by the court below." (footnote omitted)); Circus Studios, Ltd. v. Tufo, 145 Vt. 219, 222, 485 A.2d 1261, 1263 (1984) ("This Court will affirm a judgment which is correct even if the grounds stated in support of it are erroneous.").

accounts shall be annually audited, and a fair state thereof laid before the General Assembly at its biennial session in January." Vt. Const. ch. II, § 26. A look at how that provision came to be will shine some light on its meaning.[5]

¶ 18. In the time of the Vermont Republic from 1777 to 1791, before Vermont was admitted to the United States as the fourteenth state, Vermont had a functioning government with a constitution, a legislative process, and public monies that had to be managed. See Vt. Const. of 1777, https://sos.vermont.gov/vsara/learn/constitution/1777-constitution/ [https://perma.cc/A4DU-TUES]. Under Vermont's 1777 Constitution, the consent of two bodies—the General Assembly and the Governor's Council—was necessary for a bill to become a law. Vt. Const. of 1777, ch. II, § 14. The 1777 Constitution neither separated legislative, executive, or judicial powers, nor provided for judicial review of government actions. To allow for review of government actions, the Constitution called for a "Council of Censors" to meet every seven years to consider whether the legislative and executive branches exercised "other or greater powers than they are entitled to by the constitution," and to determine "in what manner public monies have been disposed of." Id. § 44. The Censors had the authority to call for a constitutional convention or other constitutional amendments. Id.

¶ 19. The 1777 Constitution did not mention auditing or provide for a public auditor. See id. Among the earliest surviving mentions of auditors of public accounts came in 1780, when Treasurer Ira Allen implored the Assembly to appoint a committee of auditors to make "a compl[ete] settlement . . . once in a year with all persons entrusted with public money." 3 State Papers of Vermont: Journals and Proceedings of the General Assembly of the State of Vermont 1778-1781, 163-64 (A. Grout ed., 1924) [hereinafter State Papers 1778]. A few days later, the

---

[5] Though we detail the historical record here at some length, we must note that "[c]ourts are, after all, staffed by lawyers, not historians." N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1, 107 (2022) (Breyer, J., dissenting). Our historical analysis is limited by the records that remain from the relevant period and the resources provided by the parties.

Assembly resolved to appoint "six Commissioners or auditors of public accounts" to "look into the expenditure of this State[']s money." Id. at 179.

¶ 20.   Throughout 1781 and 1782, the Assembly appointed and dismissed various auditors, but the historical record does not demonstrate that any complete audit of public accounts occurred.  See id. at 229, 258-59, 263, 266; see also 3 State Papers of Vermont: Journals and Proceedings of the General Assembly of the State of Vermont 1781-1783, 12-13 (A. Grout ed., 1925) (referencing report by Auditors that they were "indefatigable in [e]ndeavoring to compl[ete] the business of their appointment" but were "prevented" from doing so by books not being in order); id. at 19, 50, 102-03, 107, 133-34 (reporting auditors informed Assembly about some money that Treasurer had received and expended but noted they were "not in a capacity of reporting upon the Propriety or Justice of [the Treasurer's] accounts" beyond limited details offered).  In 1783, the only action the Assembly took was to elect three auditors.  Id. at 189.

¶ 21.   In February 1784, members of the Governor's Council asked that the Assembly request a report from the auditors on the Treasurer's books.  3 State Papers of Vermont: Journals and Proceedings of the State of Vermont 1784-1787, 7-8 (W. Crockett & R. Myrick ed., reprt. ed. 1928) [hereinafter State Papers 1784].  The next day, the Assembly accepted and sent to the Council a bill entitled "an act enabling the Auditors to possess themselves of the necessary public papers." Id. at 16.  The Council then returned the bill with a note that "such an act is unnecessary and unconstitutional." Id. at 35.  The Assembly asked for the reasons, heard them, and appointed a joint committee of Assembly members and Council members to "redraught the said bill and make such amendments and alterations as they shall judge best" and asking the bill to specify "the particular duty of the Auditors." Id.  After the joint committee recommendation, the Assembly and the Council passed the bill into law[6] in March 1784.  Id. at 61.

---

[6] The Court is unable to locate the content of some of these early laws dating from before Vermont joined the Union.  As noted by the publisher of the State Papers in the 1920s, there was only a "slight regard for the preservation of the early records during this time when the State was surrounded by her enemies." J. Wilbur, Introduction to State Papers 1778, at vii.

9

¶ 22.    In 1785, the Council of Censors convened for the first time to inquire "in what manner the public monies have been disposed of."  J. Douglas, Sec'y of State of Vt., Records of the Council of Censors of the State of Vermont 72 (P. Gillies & G. Sanford eds., 1991) [hereinafter Records of the Council of Censors], (citing Vt. Const. of 1777, ch. II, § 44), https://sos.vermont.gov/media/4aamkeww/council_of_censors.pdf [https://perma.cc/8JEP-5EY2].   The Censors noted that the Assembly was "highly censurable for omitting to enact laws adequate" to audit the public accounts prior to February 1784.  Id. at 73.  The Censors thus, in accord with their constitutional mandate to propose changes to the Constitution, proposed the following addition: "The Treasurer's accounts shall be annually audited, and a fair state thereof laid before the General Assembly, at their session in October."  Id. at 53.  This proposal was adopted at the resulting constitutional convention.  See Vt. Const. of 1786, art. II, § 25, https://sos.vermont.gov/vsara/learn/constitution/1786-constitution/ [https://perma.cc/KPY3-WVV4].

¶ 23.    The General Assembly complied with this constitutional requirement almost immediately.  On October 26, 1786, the Assembly ordered the auditors to "make a settlement of all public accounts according to the laws heretofore passed."  State Papers 1784, at 247.  Just a few months later, in February 1787, the Assembly and Governor's Council passed into law an "Act for regulating and auditing the public accounts."  Id. at 298-99.

¶ 24.    In 1791, Vermont joined the United States.  It adopted a new Constitution in 1793 which removed the earlier Constitutions' lengthy preambles criticizing New York among other changes but retained the provision requiring that the "Treasurer's accounts shall be annually audited."  See Vt. Const. of 1793, art. II, § 28, https://sos.vermont.gov/vsara/learn/constitution/1793-constitution/ [https://perma.cc/5XDN-3LUS].  A few years later, the Legislature passed another act that detailed the duties and obligations of an "Auditor of Accounts against the State," including "to audit, examine, liquidate and allow all accounts now subsisting, or which may subsist, between this state and any person or persons acting under the authority of the same"

excepting funds which "shall by law be directed to be examined and allowed by some other board, person, or persons." 1808 V.S. ch. 87, No. 1, § 2 (Oct. 30, 1797) (setting forth law passed 1797).

¶ 25. From this history, the Auditor argues that we can understand that the power of "auditing" was important to the founding of Vermont. This history also demonstrates, however, that control over the functions of auditing has long been firmly rooted in the hands of the Legislature. Since 1784, the Legislature has enacted laws detailing "the particular duty of the Auditors." State Papers 1784, at 35. The Censors recommended adding the requirement of a yearly audit to the Constitution because the General Assembly had failed to "enact laws adequate" to empower such auditing before that time. Records of the Council of Censors, at 73. This Constitutional provision is thus best understood as requiring the Legislature to maintain laws that empower an annual audit of the Treasurer's accounts.

¶ 26. In 1883, the Constitution was amended to provide that the Auditor be directly elected by the people of Vermont. Vt. Const. ch. II, § 48. The Auditor argues this 1883 addition to the Constitution demonstrates "a clear desire to transform the Office of the Auditor" into an office "insulated from" the Legislature. Citing newspaper articles at the time calling the Legislature a "totally irresponsible body" and a "mutual admiration society" which could not be trusted to choose a non-legislator over a legislator for the office, the Auditor argues that this constitutional amendment was adopted by the people to "increase [the Auditor's] independence and promote democracy."

¶ 27. The Auditor reads too much into this history. The 1883 amendment to our Constitution, making the Auditor an officer elected directly by the people, removed the authority the Legislature had to select the Auditor—it did not imbue the office with any separate authority. The historical record surrounding this amendment does not evidence any intent by the people to create an entirely new executive role without legislative guardrails.

¶ 28. The Council of Censors that convened in 1855 considered amending the Constitution to "give the election of Secretary of State, Auditor of Accounts, and Bank

11

Commissioner directly to the people." <u>Records of the Council of Censors</u>, at 522. The Council approved the recommendation and included it in its proposed amendments to the Constitution. <u>Id</u>. at 579, 590. However, the proposal to make the Auditor directly elected by the people was not adopted into the Constitution until decades later, after the Censors had recommended—and the voters approved—an amendment eliminating the Council of Censors and creating the system for amending the Constitution largely still in effect today. <u>Records of the Council of Censors</u>, at 757 (annotating Vermont Constitution and describing Vt. Const. of 1870, ch. II, § 72). In accord with the new process for amending the Constitution, the Governor used his opening address to the General Assembly in 1882 to seek the newly-seated Legislature's approval for the amendment. He explained that the process by which the Legislature selected officers at the time had led to officers who "have not always proved to be the best" and which was "distract[ing] attention from legislation" and "prevent[ing] deliberation" by legislators. S. Jour. 25, 1882 Senate, Bien. Sess. (Vt. Oct. 5, 1882). The amendment was approved in 1883. <u>Records of the Council of Censors</u>, at 746 (providing history of Vt. Const. ch. II, § 48).

¶ 29. Today, § 48 of Chapter II provides that "the Auditor of Accounts shall be elected by the voters of the State upon the same ticket with the Governor, Lieutenant-Governor, and Treasurer" and further explains that "the Legislature shall carry this provision into effect by appropriate legislation." Vt. Const. ch. II, § 48. The only modification to this amendment from the time of its adoption in 1883 to today is the change made in 1994 to replace "freemen" with "voters." See Vt. Const. ch. II, § 76 (formerly Art. Amend. 52 (1994)) (authorizing Supreme Court to revise Constitution "in gender inclusive language" without altering meaning). Taken altogether, this historical record provides no support for the argument that any Auditor has powers outside of those authorized or mandated by the Legislature.

ii. Constitutional Structure

¶ 30. The Auditor further argues that the structure and text of the Vermont Constitution indicate that he has independent constitutional authority to take actions he deems necessary to

12

carry out his role. He argues that Article 26's requirement that the "Treasurer's accounts shall be annually audited," Vt. Const. ch. II, § 26, and the Constitution's overall system of checks and balances give him a "constitutional power to audit." We are not persuaded that the Constitution grants the Auditor such power; rather, we conclude that his proposed interpretation would undermine our constitutional system of checks and balances.

¶ 31. Like the federal Constitution, the Vermont Constitution sets out a system of government with three branches that simultaneously work together and constrain each other. See Vt. Const., ch. II, §§ 1-5 (setting forth executive, legislative, and judicial power and providing that branches "shall be separate and distinct, so that neither exercise the powers properly belonging to the others"). The design of our Constitution "sought to guard against tyranny such that no branch could assume unchecked power." McCormack, 2025 VT 7, ¶ 20 (Reiber, C.J., concurring). As James Madison explained, to empower "against a gradual concentration of the several powers in the same department," a checks-and-balances system gives "those who administer each department the necessary constitutional means and personal motives to resist encroachments of the others." Federalist No. 51 (James Madison).

¶ 32. Vermont's Constitution sets out a system of checks and balances. The Legislature is composed of two bodies, the House and the Senate, and the consent of both is necessary for a bill to become a law. Vt. Const. ch. II, § 6. A bill does not become law until presented to the Governor, at which point the Governor may approve and sign, return it to the Legislature with objections, or allow the bill to become law without his signature. Id. § 11. The Judiciary interprets the laws passed by the Legislature, and the Legislature may rewrite the laws if it disagrees with this Court's interpretation. See, e.g., id. § 30; State v. Aubuchon, 2014 VT 12, ¶ 16, 195 Vt. 571, 90 A.3d 914.

¶ 33. Intra-branch checks and balances are another feature of our system of government. The Vermont Constitution and Legislature have established numerous independent, executive offices. See, e.g., Vt. Const. ch. II, § 3 (vesting Governor with "Supreme Executive power"); id.

§ 47 (establishing process for electing Treasurer); id. § 48 (establishing process for electing Secretary of State and Auditor); id. § 43 (setting forth timelines for electing, among other officers, High Bailiffs and Justices of the Peace); 3 V.S.A. § 151 (creating position of Attorney General and providing position is to "be elected at the same time and in the same manner as provided for the election of other State officers"). Even within the executive branch, offices may be limited by the Legislature, who may in turn empower the offices to limit each other. For example, the Legislature has required the Attorney General to "advise the elective and appointive State officers on questions of law." 3 V.S.A. § 159.

¶ 34. Perhaps the most fundamental check on the unrestrained exercise of executive power is that executive officers have only the powers given to them. Ward v. Barnard, 1 Aik. 121, 127 (Vt. 1825) ("[I]t is a fundamental principle, engrafted into the constitution, that all power is originally inherent in the people; and that all officers of government, whether legislative or executive, are their trustees and servants—therefore, such power, and such only, as is delegated to them, can they exercise."); Ex parte Holmes, 12 Vt. 631, 635 (1840) (explaining that "[t]here are no powers incident to the executive character . . . of this state, unless they are obviously necessary to carry into effect some of the powers expressly given" because those "who formed the American constitutions" experienced the breadth of powers claimed by royal governors prior to revolution). Even the Governor, who exercises the "Supreme Executive power," Vt. Const., ch. II, § 3, must "take care that the laws be faithfully executed" and may only "draw upon the Treasury for such sums as may be appropriated by the General Assembly." Vt. Const., ch. II, § 20; see also Holmes, 12 Vt. at 636 (comparing limited authority of Governor with "extensive and general authority" delegated to Legislature by Vermont Constitution).

¶ 35. The Auditor does not cite any authority to support his argument that his office— separate and distinct from any other empowered by the Vermont Constitution—has plenary authority to "audit," divorced from legislative authorization. The system the Auditor proposes would put him outside of our system of checks and balances. So long as he could frame his actions

14

as within the scope of "auditing," he could declare himself free to take any action. Though he contends this is a limited power, related only to the "independent examination of government funds and functions," his proposed interpretation would leave few or no legislative or judicial guardrails on his actions. Such a system is not countenanced by our Constitution.

### iii. Economic and Sociological Factors

¶ 36. The Auditor further argues that his office plays an essential role in Vermont's democracy, as he "furnishes useful information to both the General Assembly and Vermont voters so that they can assess the cost and performance of governmental programs." We have no reason to doubt the importance of audits in illuminating for Vermonters the value they get from the state's expenditures. After all, "[s]unlight is said to be the best of disinfectants." L. Brandeis, Other People's Money and How the Bankers Use It 92 (Frederick A. Stokes Co. 1914) (1913). The examples cited by the Auditor show that the Auditor has historically been able to create this value for Vermonters using the powers granted to him by the Legislature. We are therefore unpersuaded that being bound by statute constrains his capacity to play this role.

### iv. Precedent

¶ 37. The Auditor further argues that the Court has already decided that any constitutional officer has the right to sue "as an incident and in the right of his office." Dean v. Bates, 36 Vt. 387, 395 (1863). We did not so hold in Bates and do not so hold now.

¶ 38. In Dean v. Bates, the issue before the Court was about who had the right to enforce surety bonds offered to ensure the integrity of the Treasurer. In accord with the Treasurer's constitutional obligation to "give sufficient security to the Secretary of State" before entering office, the Treasurer and others executed bonds worth $100,000. Records of the Council of Censors, at 737 (describing 1850 Vt. Const., ch. II, § 25); Bates, 36 Vt. at 390-91. After the Treasurer embezzled State funds, both the State and the Secretary of State separately sued the Treasurer and the other cosigners to collect on the bonds.

15

¶ 39. The Court had to decide who could collect on the bonds. The Court dismissed the suit brought by the State, holding that "although the bonds in question were given 'in behalf of the state,' the action must be in the name of the obligee." Bates, 36 Vt. at 393. Because the bonds were given to the Secretary of State, he had to enforce them. The next question before the Court was whether the Secretary of State who received the bonds could sue or whether his successor in office could maintain the suit. We explained that the successor Secretary could sue because his office enjoys "legal perpetuity," so he could sue "as an incident and in the right of his office," because the "capacity passed with his office to his successor." Id. at 394-95.

¶ 40. Reading the Bates decision in its entirety makes clear that this Court did not establish a general rule that any officer listed in the Constitution has a right to sue "as an incident and in the right of his office" as the Auditor asserts today. Id. at 395. For all the reasons we have discussed, such a rule is not in keeping with our Constitution. See also Off. of State's Att'y Windsor Cnty. v. Off. of Atty. Gen., 138 Vt. 10, 15, 409 A.2d 599, 602 (1979) (explaining Office of State's Attorney being mentioned in Constitution does not imbue State's Attorney with any powers other than those granted by statute).

¶ 41. The Auditor also argues that we have recognized that constitutional officers have an implied power to hire their own attorneys, simply because we have previously decided suits between two constitutional officers. See Grout, 97 Vt. at 441, 124 A. at 77. Grout v. Gates was an original jurisdiction petition for mandamus filed directly in the Supreme Court by the Secretary of State against the Auditor. See id. at 437. This case does not stand for the proposition that parties have inherent constitutional authority to sue or retain counsel; rather, it speaks to the availability of mandamus between state officers. Grout therefore does not support the Auditor's position. Accordingly, the Auditor points to no precedent that supports his assertion of inherent rights by virtue of his role as a constitutional officer.

¶ 42. As the above discussion makes clear, none of the factors pointed to by the Auditor support his claim that he has inherent constitutional authority. We therefore decline the Auditor's

16

invitation to overturn our decision in OneCare that "the Auditor possesses only that authority which the Legislature has granted." 2022 VT 29, ¶ 18 (quotation omitted).

### B. Legislative Grant of Authority

¶ 43. With the Auditor lacking inherent powers to retain counsel and sue, we are left to consider whether the Auditor has legislative authorization to retain counsel and sue in this specific circumstance. Because statute provides that the Attorney General must "advise the elective and appointive State officers on questions of law relating to their official duties," 3 V.S.A. § 159, we conclude that the Auditor has implied statutory authorization to retain counsel and sue for mandamus, a command from a court ordering an official to perform a specific act, for an alleged violation of that duty. See City of Burlington ex rel. Bd. of Sch. Comm'rs v. Mayor of Burlington, 98 Vt. 388, 396, 127 A. 892, 895 (1925) (explaining "public officers . . . may maintain proceedings in mandamus to compel other officers to perform" acts subject to mandamus review (quotation omitted)).

¶ 44. The Attorney General is not exempt from mandamus review. See Bloomer v. Cheney, 131 Vt. 552, 552, 311 A.2d 101, 101 (1973) (involving petition by state senator for writ of mandamus against Attorney General); Clement v. Graham, 78 Vt. 290, 319, 63 A. 146, 154 (1906) (explaining that being "branch of the executive department of the State . . . does not place the incumbent of that office beyond the reach of [mandamus] to compel the performance of purely ministerial public duties which appertain to his office").

¶ 45. The availability of mandamus review is limited, however. Mandamus does not lie in the presence of another adequate remedy. In re Savage, 112 Vt. 89, 92, 22 A.2d 153, 155 (1941); see also Dana Corp. v. Yusitis, 127 Vt. 201, 201, 243 A.2d 790, 791 (1968). Moreover, only the person who has the right to the action imposed by law on the defendant may bring a mandamus claim against the defendant. Cook v. Treasurer of Peacham, 50 Vt. 231, 234 (1877).

¶ 46. The Attorney General notes, correctly, that the Legislature did not specifically give the Auditor the right to initiate litigation. However, "[e]xtraordinary writs such as

mandamus . . . are remedies of ancient common law origin." Hunt v. Vill. of Bristol, 159 Vt. 439, 440, 620 A.2d 1266, 1267 (1992) (quotation omitted). Though Vermont has abolished the formal writs, relief "in the nature of mandamus" is available through Rule 75 to "prevent an abuse of executive discretion . . . where no other remedy is available." Reporter's Notes, V.R.C.P. 75. Our case law is replete with officials seeking, and sometimes receiving, mandamus without setting forth specific authorization to sue. See, e.g., Grout, 97 Vt. at 441, 124 A. at 77 (involving Secretary of State seeking mandamus against Auditor); State Highway Bd. v. Gates, 110 Vt. 67, 70-71, 1 A.2d 825, 826 (1938) (involving State Highway Board seeking mandamus against Auditor); Fay v. Barber, 72 Vt. 55, 56, 47 A. 180, 181 (1899) (involving Justice of the Peace seeking mandamus against Auditor).

¶ 47. At oral argument, the Attorney General suggested that her office need not be subject to mandamus because political pressures ensure her compliance with the law. This argument is unconvincing. Political pressures may not always align with the obligations imposed by law, and we will not limit enforcement of the law based on politics. The Attorney General further suggested that the Auditor could ask the Governor to "employ counsel," pursuant to 3 V.S.A. § 5, to sue her to make her comply with the mandates of 3 V.S.A. § 159. Requiring the Auditor to ask another political office to act is not the sort of "adequate remedy at law" that would preclude issuance of a writ of mandamus. Island Indus., LLC v. Town of Grand Isle, 2021 VT 49, ¶ 21, 215 Vt. 162, 260 A.3d 372 (quotation omitted).

¶ 48. In a situation in which the Attorney General refuses to provide advice to an "elective [or] appointive State officer[]," the only person who could seek recourse through mandamus to order the Attorney General to comply with 3 V.S.A. § 159 is that officer. By giving the Auditor a statutory right to be "advise[d] . . . on questions of law relating to [his] official duties," 3 V.S.A. § 159 empowers him to sue to enforce that right. Mandamus is a "writ of right, demandable in a civil action whenever it is an appropriate remedy." City of Burlington, 98 Vt. at

18

396-97, 127 A. at 895-96. Because 3 V.S.A. § 159 compels the Attorney General to "advise . . . on questions of law," those entitled to that advice have the right to seek mandamus for it.

### III. Mandamus

¶ 49. Having concluded that the Auditor has the authority to seek mandamus to enforce § 159, we must consider whether he is entitled to it here. "Mandamus is an extraordinary remedy," and is only available when three conditions are satisfied. Maple Run Unified Sch. Dist. v. Vt. Hum. Rts. Comm., 2023 VT 63, ¶ 11, 218 Vt. 496, 311 A.3d 139. First, "the petitioner must have a clear and certain right to the action sought by the request for a writ;" second, the writ must be for the "enforcement of ministerial duties" and not to review the performance of official acts involving the exercise of judgment or discretion; and third, "there must be no other adequate remedy at law." In re Fairchild, 159 Vt. 125, 130, 616 A.2d 228, 231 (1992).

¶ 50. The Auditor's complaint seeks mandamus to order the Attorney General to "comply with [her] duty under" 3 V.S.A. § 159 and the Vermont Constitution. The Attorney General moved to dismiss this count on several grounds, including on the theory that mandamus is "not available to compel discretionary decisions." Maple Run, 2023 VT 63, ¶ 11 (quotation omitted). In exceptional cases, mandamus may be available to enforce a "discretionary decision where a public official or body has engaged in an arbitrary abuse of power which amounts to a virtual refusal to act or to perform a duty imposed by law." Id. (alterations and quotation omitted). However, in "each case where we have endorsed mandamus relief due to an arbitrary abuse of power, we have required that the alleged arbitrary abuse of discretion amount to a practical refusal to perform a certain and clear legal duty." Id. (quotation omitted).

¶ 51. We agree with the Auditor that 3 V.S.A. § 159 requires the Attorney General to advise on questions of law. State v. Hemingway, 2014 VT 48, ¶ 11, 196 Vt. 441, 97 A.3d 465 ("[T]he imperative 'shall' indicates that the [statutory] provision is mandatory."). However, we also agree with the Attorney General that she has discretion to provide legal advice in accord with her judgment. As the trial court noted, a lawyer's "provision of a legal opinion to a client" is a

19

"matter uniquely in the lawyer's judgment and discretion." See Grout, 97 Vt. at 450-51, 124 A. at 81 ("If the duty is one that requires the exercise of judgment in its performance it is not ministerial but discretionary."); see also Marbury v. Madison, 5 U.S. 137, 166 (1803) ("[I]n cases in which the executive possesses . . . legal discretion, nothing can be more perfectly clear than that their acts are only politically examinable.").

¶ 52. Thus, the Attorney General is not subject to mandamus review unless she has refused "to perform a certain and clear legal duty," Maple Run, 2023 VT 63, ¶ 11, such as her duty to "advise . . . on questions of law." 3 V.S.A. § 159. The Auditor argues that he can show such a refusal by the Attorney General.

¶ 53. The complaint seeks a writ of mandamus to order the Attorney General to answer these two specific questions posed by the Auditor:

> 1. Do bond premiums fall under the definition of financing in 24 V.S.A. § 1891(7)?
>
> 2. Are municipalities required to obtain authorization from VEPC and municipal voters for the aggregate bond proceeds (principal and premium) which will be used to pay for public infrastructure improvements of a tax increment financing (TIF) district?

The Auditor attached to his complaint the resulting letters between his office and that of the Attorney General. Because the Auditor's complaint relies on these letters, we may properly consider them in evaluating a motion to dismiss. Davis, 2014 VT 134, ¶ 13.

¶ 54. The letters reflect the following exchange. The Attorney General's first response to the Auditor offered context about the Vermont Economic Progress Council (VEPC) rulemaking process and stated that "[f]or reasons previously discussed, we decline to opine on the interpretation of provisions in title 24 requested above." The Auditor responded, quoting that line, asserting that the Attorney General's "policy is not to provide opinions to my office going forward," and threatening to sue the Attorney General for her asserted noncompliance with 3 V.S.A. § 159.

20

¶ 55.    The Attorney General's final response to the Auditor was lengthy and provided further explanation for her initial response.  First, she opined that the Auditor lacks "authority to unilaterally initiate litigation on behalf of or against the State."  Next, she stated that the Auditor's letter rested on "several mistaken understandings," and clarified that there was "no such policy" of refusing to provide opinions to the Auditor.  She explained that the confusion likely arose from the semantic difference between formal "Attorney General Opinions," which are rare and publicly posted on the Attorney General's website, and informal opinions and legal advice, which are commonly provided to state entities.

¶ 56.    Most importantly, however, the Attorney General's letter explained in detail the Auditor's statutory requirements to audit TIF districts, the Agency of Commerce and Community Development's (ACCD) statutory obligation to "issue decisions to a municipality on questions and inquiries concerning the administration" of TIF districts, and VEPC's role in both formal rulemaking and in making recommendations that inform the ACCD process.  The letter also offered some historical context, noting that the Attorney General had provided approximately twenty informal opinions to the Auditor about TIF districts.  It detailed the consequences of having given those opinions, including requests for reconsideration and meetings by a municipality.  For these reasons, the Attorney General concluded that the Auditor's two questions "are more appropriately resolved by [the City of Burlington], ACCD, and VEPC."

¶ 57.    Because the Attorney General did not give him a yes-or-no answer to the questions he asked, the Auditor asserts that he is entitled to a writ of mandamus.  This misconstrues the obligations of the Attorney General pursuant to 3 V.S.A. § 159.  The provision requires the Attorney General to "advise" on questions of law, not to "answer" the questions as posed.  The Auditor's attempt to conflate "answer" with "advise" is unavailing because the statutory text requires the latter and not the former.  The Attorney General need not provide definitive answers on unsettled questions of law, as argued by the Auditor.  So long as the Attorney General

21

"advise[s]," no court may issue a writ of mandamus against her ordering her to provide different advice. 3 V.S.A. § 159.

¶ 58. A decision arising out of a mandamus suit against the Arizona Attorney General is instructive. See Yes on Prop 200 v. Napolitano, 160 P.3d 1216 (Ariz. Ct. App. 2007). In that case, a group assembled to challenge the substance of an opinion given by the Attorney General to a state officer. Id. at 1222-23. Since mandamus is available in Arizona for a discretionary duty of an officer only if the officer abuses that discretion, plaintiffs argued that the Attorney General abused his discretion in issuing an incorrect opinion. Id. at 1223. The court declined to evaluate the legal correctness of the Attorney General's opinion because, if a mandamus action allowed for such analysis, "courts would effectively become direct legal advisors to the government" and would need to decide "previously unsettled legal questions" to determine whether the Attorney General's opinions were erroneous and thus an abuse of discretion. Id.

¶ 59. This reasoning is persuasive. If mandamus were available to review the completeness or correctness of legal opinions of the Attorney General, courts would become de facto supervisors of the Attorney General's legal advice. Such a role is not countenanced by the separation-of-powers principles embedded in the Vermont Constitution. See Vt. Const. ch. II, § 5 ("The Legislative, Executive, and Judiciary departments, shall be separate and distinct, so that neither exercise the powers properly belonging to the others."); Turner v. Shumlin, 2017 VT 2, ¶ 8, 204 Vt. 78, 163 A.3d 1173 (per curiam) ("Vermont courts are vested with subject matter jurisdiction only over actual cases or controversies involving litigants with adverse interests." (quotation omitted)). As the trial court explained here, if it policed the content of an Attorney General opinion, "that opinion might later be argued as the position of the State in an action before the same Court. It would then fall to the Court to determine what the actual law is on the subject, despite its prior involvement in forming the State's position."

¶ 60. The Yes on Prop 200 court further explained that even if a "decision issued by the Attorney General could be so deficient as to be a complete failure to fulfill the statutory obligation

22

to issue an opinion, our review indicates that, as a matter of law, such is not the case here." 160 P.3d at 1223-24. So too here. In the instant suit, the Attorney General's detailed explanation about who has the authority to substantively answer the Auditor's questions constitutes legal advice "on questions of law." 3 V.S.A. § 159.

¶ 61. Although the Attorney General stated in her initial response that she "decline[d] to opine on the interpretation of provisions in title 24 requested above," this does not mean that she refused to give any legal advice in response to the Auditor's questions. We are not bound by the labels parties use to characterize their situation. See, e.g., Burchesky v. Dep't of Emp. Training, 154 Vt. 355, 359-60, 577 A.2d 672, 674 (1989) (explaining courts look to substance of employment relationship to classify relationship and not to expressed intent); Powers v. Off. of Child Support, 173 Vt. 390, 399, 795 A.2d 1259, 1266 (2002) (recognizing courts look to gravamen of complaint "rather than its precise terminology"). In her initial letter to the Auditor and in the letter that followed, the Attorney General explained that statutes provided entities other than the Attorney General with the authority to make binding decisions and provide legal oversight relevant to the questions posed. In effect, the Attorney General "advise[d] . . . on questions of law" where the law was unsettled by directing the Auditor to the entities with statutory authority to make binding decisions on the questions, rather than to herself, whose opinion on the matter would be only advisory. 3 V.S.A. § 159.

¶ 62. The Auditor's attempts to distinguish Yes on Prop 200 are unpersuasive. He first argues that the Attorney General did not provide any legal analysis, so the Arizona court's analysis is inapplicable. As noted above, we disagree and conclude that the Attorney General did "advise . . . on questions of law." Id. The Auditor next argues that the separation-of-powers analysis is inapplicable because the Arizona Attorney General is a constitutional officer and the Vermont Attorney General is not. This argument misreads the case; the separation-of-powers issue in the Yes on Prop 200 case related to the judicial branch supervising the executive branch without a live dispute before it. The source of the Attorney General's authority is irrelevant to our concern

23

about turning courts into supervisors of the Attorney General—undisputedly a member of the executive branch—without a live dispute. The Auditor is correct to note that we do not violate our Constitution's principle of separation-of-powers in deciding disputes between state officials. In re Hill, 149 Vt. 431, 438-39, 545 A.2d 1019, 1024 (1988). However, our "strong tradition of self-restraint and the imperative rule that no order be framed more broadly than necessary to serve the interests of justice and solve the conflicts before the Court" requires us to conclude that mandamus is not available to order the Attorney General to provide different legal advice on the record before us here. Id. at 439, 545 A.2d at 1024.

¶ 63. Because the Attorney General advised the Auditor on questions of law he posed to her and because courts must decline to review the content of that advice for error, the Auditor failed "to state a claim upon which relief can be granted." V.R.C.P. 12(b)(6). Therefore, the trial court appropriately dismissed the Auditor's request for a writ of mandamus.

IV. Declaratory Judgment on 3 V.S.A. § 159

¶ 64. The final allegation in the Auditor's complaint is that the Attorney General has instituted a policy that it would no longer provide opinions to the Auditor. The Auditor seeks a declaratory judgment about the Attorney General's duties to provide opinions to him, beyond just the two TIF questions posed to her.

¶ 65. Neither the complaint nor the Auditor's response to the motion to dismiss below clearly explained that the Auditor's request for declaratory judgment relied on the Attorney General's purported policy of not answering legal questions from the Auditor. The complaint does not specify which of the Attorney General's duties are at issue. The Auditor's opposition to the motion to dismiss urged the trial court to "enter a judgment declaring that the Attorney General must respond to the two questions of law." The trial court reasonably understood the Auditor's request for a declaratory judgment to apply only to the two specific questions related to TIFs discussed above and did not rule on his broader claim.

24

¶ 66. Despite the lack of clarity in the Auditor's presentation to the trial court, the Auditor nevertheless preserved this claim for our review. The Auditor emphatically argued at the hearing on the motion to dismiss that the declaratory judgment request in the complaint was not moot because the complaint asserts that the Attorney General has a new policy of not responding "to requests for legal advice" from the Auditor. We agree with the Auditor that the trial court's 12(b)(6) dismissal of this claim did not reckon with this asserted policy. On appeal, the Auditor seeks a reversal of the dismissal of this request for declaratory judgment and asserts that the claim reflects an actual controversy between the parties.

¶ 67. As an initial matter, we note that this claim is substantively a request for mandamus, as the request is for an order directing the Attorney General to comply with her statutory duty to "advise . . . on questions of law" under 3 V.S.A. § 159. As such, the Auditor has the authorization to bring this claim. However, we only have subject-matter jurisdiction over "actual cases or controversies." Ferry, 2023 VT 4, ¶ 11 (quotation omitted). "Ripeness is a prerequisite to subject-matter jurisdiction." Echeverria v. Town of Tunbridge, 2024 VT 47, ¶ 12, __ Vt. __, 325 A.3d 98. "A claim is not ripe 'if the claimed injury is conjectural or hypothetical rather than actual or imminent.' " Doe v. Dep't for Child. & Fams., 2020 VT 79, ¶ 9, 213 Vt. 151, 249 A.3d 665 (quoting Turner, 2017 VT 2, ¶ 9).

¶ 68. We must first decide if there is a live controversy between the parties regarding the Attorney General's obligations to provide advice pursuant to 3 V.S.A. § 159. The Auditor's complaint asserts: "In February 2023, the Office of the Attorney General informed the Office of Auditor of Accounts that it would no longer provide opinions to the Office of Auditor of Accounts." Attachments to the complaint, however, indicate that the Attorney General has provided legal advice since that time, in the form of the letters responding to the Auditor's questions enumerated above. "[W]hen a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." Davis, 2014 VT 134, ¶ 13 (alteration in original) (quotation omitted). Accordingly, because the attached exhibits contradict

25

and undermine the allegations of the complaint, we consider the facts presented in the exhibits and not the allegation in the complaint, which show the Attorney General providing legal advice after February 2023. Moreover, during the hearing on the motion to dismiss before the trial court, the Attorney General agreed with the Auditor that 3 V.S.A. § 159 "imposes . . . duties on the Attorney General and the Attorney General's Office."

¶ 69. The Auditor, in his briefing here, argues that there were other questions of law that the Auditor has asked of the Attorney General for which he has not been given answers, thus limiting his ability to complete certain audits. After the hearing on the motion to dismiss below, the Auditor provided a list of additional legal questions for which he needed answers. However, that document, on its face, explains that the questions "were not submitted" to the Attorney General. At oral argument, counsel for the Auditor clarified that the Auditor never posed those questions to the Attorney General. We do not permit resort to the declaratory-judgment mechanism "where the action or activity to be tested is still only anticipatory and subject to voluntary avoidance." Doe, 2020 VT 79, ¶ 14 (quotation omitted). The Auditor cannot manufacture a live controversy requiring judicial intervention by not asking questions of the Attorney General and then claiming that the Attorney General is refusing to answer the unasked questions.

¶ 70. Because there is no live controversy between the parties, dismissal of the Auditor's request for declaratory judgment related to the Attorney General's obligations under 3 V.S.A. § 159 was appropriate. V.R.A.P. 12(b)(1); see Hous. Our Seniors in Vt., Inc. v. Agency of Com. & Cmty. Dev., 2024 VT 12, ¶¶ 8, 10, __ Vt. __, 315 A.3d 1000 (explaining we may "affirm a lower court's decision if the record before us discloses any legal ground which would justify the result" and affirming decision to dismiss invoking Rule 12(b)(6) on Rule 12(b)(1) grounds (quotation omitted)).

26

## V. Rule 54 Fees

¶ 71. The final issue in this case involves attorneys' fees. After the court dismissed the three claims in his complaint, the Auditor moved for attorneys' fees pursuant to Rule 54(d)(2). The trial court denied the motion.

¶ 72. On appeal, the Auditor explains that he "was not expecting that the Attorney General pay the Auditor directly as the [c]ourt apparently assumed." The Auditor's motion for fees did not so specify, though his reply explained that the motion for fees was to enforce his own contract with his attorneys. The Auditor brought his motion as a Rule 54 request, so we consider it through that lens.

¶ 73. We review a trial court's ruling on attorneys' fees for abuse of discretion. Fletcher Hill, Inc. v. Crosbie, 2005 VT 1, ¶ 3, 178 Vt. 77, 872 A.2d 292. To the extent the trial court's decision relies on conclusions of law, we review those conclusions de novo. In re Soon Kwon, 2011 VT 26, ¶ 7, 189 Vt. 598, 19 A.3d 139 (mem.).

¶ 74. The trial court denied the motion for fees on several grounds. The court explained that Grout v. Gates does not require a court-ordered award of attorneys' fees. See 97 Vt. at 454, 124 A. at 82. It then explained that the Auditor's assertion that he is entitled to fees because the Attorney General failed to comply with state contracting rules is a substantive claim that would need to be pleaded and proven, not the sort of relief that can be awarded under Rule 54. As such, the trial court concluded that Rule 54 "is entirely inapplicable in these circumstances."

¶ 75. We begin by looking to the language of the rule. Rule 54(d) provides, in relevant part:

> (1) Costs Other Than Attorneys' Fees. Costs other than attorneys' fees shall be allowed as of course to the prevailing party, as provided by statute and by these rules, unless the court otherwise specifically directs. Costs shall be taxed against the State of Vermont only to the extent permitted by law.

> (2) Attorneys' Fees.

(A) Claims for attorneys' fees for services rendered in connection with a pending action, and related nontaxable expenses, shall be made by motion in the action unless the applicable substantive law provides for the recovery of such fees as an element of damages to be proved at trial or in an independent action.

(B) Unless otherwise provided by statute or order of the court, the motion must be filed and served no later than 14 days after entry of judgment; must specify the judgment and the statute, rule or other grounds entitling the moving party to the award; and must state the amount or provide a fair estimate of the amount sought.

V.R.C.P. 54(d). Rule 54 is "only procedural in its effect" and "creates no new substantive right to recover attorneys' fees." Reporter's Notes—1996 Amendment, V.R.C.P. 54. To receive attorneys' fees, a party must specify the grounds under which the moving party is entitled to the award. V.R.C.P. 54(d)(2)(B).

¶ 76. To start, a contract between the Auditor and his attorney is not the sort of contractual entitlement to fees contemplated by Rule 54. A party who has contracted with his attorney presumably bears an independent obligation to make payment. A court order is not necessary to effectuate the contract between the Auditor and his counsel. This contrasts with the sorts of contracts that provide for fee-shifting in the event of a lawsuit between two contracting-but-later-adverse parties. See, e.g., Kneebinding, Inc. v. Howell, 2018 VT 101, ¶ 104, 208 Vt. 578, 201 A.3d 326 (reciting contractual provision that purportedly provided grounds for fee shifting); Bourdeau Bros. v. Boissonneault Fam. Farm, Inc., 2020 VT 35, ¶ 6, 212 Vt. 231, 236 A.3d 1263 (same).

¶ 77. Neither the Auditor's briefing below nor on appeal cites any precedent in which a court granted a Rule 54 motion for a court order requiring the moving party to pay his own counsel. The Court was unable to locate any case in which a court used Rule 54 to craft such an order. But there are many cases recognizing Rule 54 as the procedural mechanism to request attorneys' fees from an opposing party under an exception to the American Rule. See, e.g., Concord Gen. Mut. Ins. v. Woods, 2003 VT 33, ¶¶ 17-18, 175 Vt. 212, 824 A.2d 572; Perez v. Travelers Ins. ex rel. Ames Dep't Stores, Inc., 2006 VT 123, ¶¶ 5-8, 181 Vt. 45, 915 A.2d 750. This makes sense

28

because Rule 54, by its terms, empowers litigants to raise "[c]laims for attorneys' fees." V.R.C.P. 54(d)(2)(a). In the context of a lawsuit, a "claim" is brought against an opposing party. The sort of order the Auditor seeks in his fee motion is not available through the mechanism of Rule 54.

¶ 78. Additionally, only prevailing parties may seek attorneys' fees under Rule 54. Subsections (d)(1) and (d)(2) distinguish between costs, appropriately allowed to the prevailing party as a matter of course, and fees, which are only occasionally allowed to the prevailing party. See Murphy v. Sentry Ins., 2014 VT 25, ¶ 50 n.1, 196 Vt. 92, 95 A.3d 985 (explaining distinction between costs and fees). The Reporter's Notes—1996 Amendment to Rule 54 explain that the rule seeks to provide "a standardized procedure for those cases in which the prevailing party is entitled to attorneys' fees by law." (Emphasis added.) The rule does not contemplate the award of attorneys' fees to a party that did not prevail. Here, there is no doubt that the Auditor, who had each of his claims dismissed, was not the prevailing party. The Auditor is not entitled to attorneys' fees under Rule 54, and the trial court properly denied his motion.

¶ 79. Finally, contrary to the Auditor's argument, Grout is inapplicable to this situation. In Grout, the Secretary of State sued the Auditor seeking mandamus over the Auditor's refusal to "issue his warrants in payment of bills" for a fund of money purported to be allocated by the Emergency Board. 97 Vt. at 444, 124 A. at 78. At issue was the authority of the Emergency Board to find an emergency and thus authorize the expenditure of additional funds for Vermont's fledgling Automobile Department. After we resolved the case on the merits and dismissed the petition for mandamus, we stated:

> The importance and difficulty of the questions here involved are such that the complainant was justified in bringing this action, and the defendant was equally justified in defending it. We therefore assume that the expenses on both sides, including counsel fees, will be, as they should, paid by the State.

Id. at 454, 124 A. at 82. The issue of payment to attorneys was not before the court in that case. Neither party briefed the issue. At best, this comment was "obiter dictum," a "judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case

and therefore not precedential (although it may be considered persuasive)." <u>Dictum</u>, Black's Law Dictionary (12th ed. 2024). Moreover, this statement does not purport to create a rule of law establishing entitlement to fees for "important[t] and difficul[t]" cases. <u>Grout</u>, 97 Vt. at 454, 124 A. at 82. This errant comment plays no role in our Rule 54 analysis.

¶ 80. The Auditor moved for fees solely under Rule 54. To the extent the Auditor asserts that this claim is for the right to pay his attorney from funds available to his office, that claim was not pleaded below and is not properly before us. In this appeal of the Rule 54 fee motion, the parties briefed numerous other issues related to the executive branch's system for monitoring and approving expenditures. As these are irrelevant to the Rule 54 motion brought by the Auditor, we do not consider them here.

## VI. Conclusion

¶ 81. In summary, we reverse the trial court's dismissal of the Auditor's claim for declaratory judgment about his right to sue the Attorney General for mandamus relief. We hold that the Auditor's powers are defined by the Legislature, but that 3 V.S.A. § 159 empowers him to bring a mandamus claim against the Attorney General for failure to comply with that statute. We affirm the trial court's dismissal of the Auditor's claims for mandamus related to the specific questions he posed about TIFs to the Attorney General and for declaratory judgment related to the Attorney General's purported policy of not offering legal advice to the Auditor. Finally, we affirm the trial court's denial of attorneys' fees to the Auditor.

<u>Reversed as to dismissal of the claim for declaratory judgment that the Auditor has the right to retain counsel and sue for mandamus to comply with 3 V.S.A. § 159. Judgment is entered in the Auditor's favor on that claim in accord with this opinion. In all other respects, the trial court's decision is affirmed</u>.

FOR THE COURT:

_____

Associate Justice