Filed 02/05/26

| VERMONT SUPERIOR COURT | | CIVIL DIVISION |
|---|---|---|
| Washington Unit |  | Case No. 24-CV-01918 |
| 65 State Street | | 24-CV-1926 |
| Montpelier VT 05602 | | |
| 802-828-2091 | | |
| www.vermontjudiciary.org | | |

---

**Springfield School District, Board of Directors v. Zoie Saunders, Interim Secretary, Vermont Agency of Education et al.**
**&**
**Mountain Views Supervisory Union, Board of Directors v. Zoie Saunders, Interim Secretary, Vermont Agency of Education et al.**

---

## ENTRY REGARDING MOTION

Title:         Motion to Dismiss  (Motion: 2)
Filer:         David R. Mclean
Filed Date:    September 27, 2024

The motions are DENIED.

The Court is confronted with a complicated administrative issue that involves the intersection between local and regional schools' obligation to provide services to disabled students residing within their geographical boundaries and the State of Vermont's process for funding alternative services under state and federal law.  The precise question posed by both cases is how the responsibility to pay for a disabled student, who requires residential placement outside of the immediate district, should be allocated between the State, through its various agencies, and the regional supervisory school union/school district directly overseeing the pupil under 16 V.S.A. §§ 261a(a)(6) and 729(f).

These cases are presently before the Court on a motion to dismiss. [1]  As outlined below, the Court finds that Plaintiffs  have stated sufficient facts to make a claim for relief, and that the true dispute lies in the factual record, which is not presently before the Court's review.[2]  For these reasons, the State's motion to dismiss in both cases is **Denied** at this time.

---

[1] While there are several factual nuances between the two cases, the parties in both cases have retained the same counsel and have filed nearly identical briefs.  For purposes of judicial economy, the Court has drafted a combined decision addressing both cases due to the overlap in issues between the two cases.  While cases remain separate and no joinder has been ordered at this time under V.R.C.P. 18, the Court decision in both cases reflect identical analysis.

[2] The Court has drafted this consolidated decision for both cases.  While each case has been brought by a different school district, involving a different student, in separate dockets, the defendants in each are the same.  Both sets of plaintiffs are represented by the same counsel and have raised nearly identical issues.  The complaints in both cases

1

## I. Factual Overview and Legal Framework

The Plaintiffs in these cases are the Mountain Views Supervisory Union Board of Directors (MVSU) and the Springfield School District Board of Directors (Springfield). The Defendants in both instances are the State's Agency of Education and Agency of Human Services.[3]

The underlying factual issues in each case may be summarized as follows.

### A. Mountain Views

With regard to Docket No. 24-CV-1926, MVSU alleges that their issue began on May 3, 2022 when a coordinated services plan team (the Team) convened to prepare a coordinated services plan for an MVSU student with significant developmental needs. The Team was comprised of the student's parents, representatives of Health Care and Rehabilitation Services, the Designated Agency for Windsor County, and representatives from MVSU. Since the student appeared to need residential placement, the Team referred the matter to the Case Review Committee (Committee), pursuant to Act 264. When MVSU had not received a response from the Committee by August, MVSU elected to place the student in a residential program at the start of the school year and informed the State Interagency Team (SIT) of this choice and its decision to seek reimbursement for this placement pursuant to the Interagency Agreement that governs issues under the Individuals with Disabilities Education Act.

On January 11, 2023, the Agency of Human Services' Interagency Team notified MVSU that the Agency was denying the reimbursement requests as not being addressed to the appropriate entity. The Agency also notified MVSU that the Designated Agency had determined that the student's medical necessity was not met. Furthermore, since the student had been placed, it was too late to appeal any determinations of need. The Agency stated:

---

were filed May 16, 2024.The State's motion to dismiss makes identical arguments against both sets of plaintiffs, and the briefing schedule for the cases has followed identical timelines. At a combined oral argument, plaintiffs presented a unified argument against dismissal and did not indicate that one school had a substantially different legal posture or factual distinction that would alter the outcome at this stage. For these reasons and for the purpose of judicial efficiency and consistency, the Court has consolidated the common issues within the Defendants' motions into a single decision. V.R.C.P. 18(a). In doing so, the Court has not joined the cases entirely or made one School District a party to the other's claims. The cases will remain separate as they go forward, unless the parties stipulate to further consolidation of issues.

[3] Named defendants include the Secretaries of the Agency of Education (AOE) and the Agency of Human Services (AHS) in their official capacities only.

This letter is to follow up on the request you made to the State Interagency Team for reimbursement of non-educational costs for a student placed by the Local Education Agency (LEA) in a residential facility.

After dialogue with Agency of Human Services (AHS) and Agency of Education representatives and review of relevant regulations and procedures, we have determined that AHS is not the appropriate fiscally responsible entity for the non-educational provision of services occurring at the facility. The required procedure for requesting residential placement through AHS, while initially followed, did not result in a decision approving residential placement. The process we must follow is driven by Act 264, the Interagency Agreement, the Case Review Committee guidelines and procedures, and Medicaid policy.

The following steps need to occur for residential placement and funding through AHS:

1. For children/youth not under the custody of the Department for Children and Families, the Designated Agency (DA) holds the authority to determine initial medical necessity for residential treatment.

2. The DA then provides a residential referral packet to the appropriate department at AHS (Department of Mental Health or the Department of Disabilities, Aging and Independent Living, the Department for Children and Families is responsible for youth in DCF custody).

3. Final authority to approve or deny requests for residential referral rests with the funding department. The AHS department determines if its criteria for residential and out-of-home care have been met and if so, brings the request to the Case Review Committee (CRC) for review that criteria were applied consistent with standards and advising on placement options.

4. The appropriate lead AHS department provides a notice of decision to the parent/guardian and local Designated Agency indicating denial or approval of the request and the specific program(s) approved. The AHS department works with the DA through the referral and admission process.

The interagency process was followed when the DA reviewed the request for residential and determined that medical necessity was not met. While we respect the decision of the LEA, the decision and placement were made outside of the interagency process. Entities cannot use an alternative process to seek interagency funding when dissatisfied with the outcome after the process was followed. The Interagency Agreement outlines the process in instances when there is disagreement, and this process must be followed prior to any placement occurring.

See Letter from Cheryle Wilcox and Beth Sausville to Sherry Sousa (MVSU Superintendent). This was the first time that MVSU had been notified that at some point after evidently agreeing to the placement, HCRS decided instead that medical necessity did not exist.[4] Notably, the letter is silent as to whether MVSU ever should have been notified by HCRS (or anyone else) of the denial—particularly when HCRS representatives initially had indicated that they supported the residential placement—what redress MVSU should have had in the event of such notice had there been any, and how MVSU could have complied with its legal obligations without having made the placement itself.

### B. Springfield

With regard to Docket No. 24-CV-1918, Springfield alleges that its version of the Team (parents, school officials, and Designated Agency representatives) convened on April 26, 2022 to prepare a coordinated services plan for a Springfield student with significant behavioral needs. As with MVSU, the Team included members from Health Care and Rehabilitation Services, the Designated Agency for Windsor County. It was the Teams understanding that the Designated Agency supported referring the student to the Case Review Committee for placement. On July 1, 2022, the Designated Agency notified the parent of the Springfield student that it did not support residential treatment. The Designated Agency did not send a copy of this letter to the Springfield School District. On July 19, 2022, the Designated Agency asked the Springfield

---

[4] The only evidence of HCRS's medical necessity determination in the record is the reference to it in this letter. It is unclear when the decision was made, who made it, what the rationale for the denial may have been, and why no one ever communicated it to MVSU. As far as the record goes, the State itself never has taken a position on medical necessity for Student's residential placement. Instead, it points to HCRS's determination, which it at least implicitly maintains is unreviewable.

School District contacts if the referral had been made to the Case Review Committee and stated that the Designated Agency would be putting a no down to residential referral.

The Springfield School District felt it had no choice but to put the student into residential treatment and began the process of seeking reimbursement. On July 29, 2022, the Springfield Superintendent notified the State Interagency Team of the school district's intent.

On January 11, 2023, the State Interagency Team denied the reimbursement requests with an identical letter to the one sent to MVSU. The Agency denied the request because Springfield had not followed the proper procedures for requesting residential placement and that the Agency of Human Services was not the appropriate agency for non-education provisions. Specifically, the letter stated:

> In this instance, the DA did not find medical necessity and instead recommended the following:
>
> - Reconnect with Healthcare and Rehabilitation Services (HCRS) outpatient services to engage with individual & family therapy, case management, respite and or skills work and groups.
> - Continue to collaborate with school regarding establishing a school placement in the fall
> - Continue to collaborate with parent advocates from either Vermont Family Network or Vermont Federation of Families
> - Explore additional intensive community supports such as Vermont Support & Stabilization or Intensive Family Based Services through the Department of Children and Families.

See Letter from Cheryle Wilcox and Sherri Nichols (Springfield Superintendent). As with the MVSU letter, the Springfield letter is silent as to what redress Springfield should have had in the process, and how it could have complied with its legal obligations without having made the placement itself.

### C. Administrative Framework

At this point, it is critical to define some of the key concepts that underlie these events.

Residential placement refers to the "placement of an eligible child, as part of an individualized education program, in a 24-hour residential facility within or outside Vermont that

provides educational services consistent with the child's program."  16 V.S.A. § 2942(5).  For the purposes of the present cases, the process for residential placement and obtaining funding can take two different paths.

In the simplest terms, so far as Vermont statutes go, the first path is for the State, through the Agency of Human Services (AHS), to accept full financial responsibility for a residential placement made pursuant to 33 V.S.A. §§ 4301–4305 (Children and Adolescents with Severe Emotional Disturbance) (commonly referred to generally as Act 264).  The Act 264 process is subject to Medicaid regulations that require a determination of medical necessity before a residential placement is made.[5]  The State delegates the determination of medical necessity to so-called designated agencies, which are third party, non-State entities.[6]

The second path is for the supervisory union to make the placement and seek "extraordinary special education reimbursement" from the State, through the Agency of Education (AOE), pursuant to 16 V.S.A. § 2962.  See Special Education Rules § 2364.4.1, Code of Vt. Rules 22-000-006 (Lexis).  Allowable extraordinary expenses include those "required under federal law in order to implement fully individual education programs under the Individuals with Disabilities Education Act [IDEA], 20 U.S.C. chapter 33" but do not include the first $60,000 (subject to annual increases) of such expenses.  16 V.S.A. § 2962(a)(2), (3).

### D.  The Schools' Claims to Reimbursement

In the present cases, MVSU and Springfield (the Schools) claim that their duty under the IDEA and Vermont law is to provide its students a "free and appropriate education," and that in the case of these two particular students (Students) this obligation manifestly required a residential placement.  This decision, initially made at the local level by the Schools' respective

---

[5] The parties do not explain the relevant Medicaid regulations in any detail, and the court declines to explore those regulations in this decision.

[6] The parties do not identify the authority for such delegations or what process and standards may apply to designated agencies' determinations of medical necessity in this context.  A document dated April 2025 and entitled "Case Review Committee Guidelines and Procedures for Residential Placement of Children and Adolescents" at 4–5 says this much: "It is the decision of the Medicaid Managed Care Entity (MCE), the Department of Vermont Health Access (DVHA), to determine medical necessity.  However, DVHA delegates that authority to AHS Departments. DMH and DAIL delegate specific components of authority to their respective Designated Agencies (DA).  If an outside provider finds medical necessity for residential treatment where a DA/Department/DVHA (MCE) does not, then the DA/Department/DVHA (MCE) decision prevails.  Appeal rights for MCE decisions follow the respective department's grievance and appeal procedures (refer to #11 below)."  There is no "#11 below."  Moreover, it is unclear whether this process existed prior to April 2025, during the events of this case.

Teams, was supported by the Students' parents and all other local decisionmakers. The Schools then pursued the Act 264 process with the State. That process, the Schools complain, was impenetrably murky and slow and resulted in a preliminary denial due to a perceived lack of medical necessity, of which the Schools were not given timely notice. This lack of notice left them with no opportunity for appeal or further redress from the State. Both Schools assert that they, with no reasonable way to comply with the IDEA, had to initiate and begin to pay for the placement on their own and seek reimbursement from the State thereafter under Act 264. At that point, however, the State's position became (and has remained) that MVSU's and Springfield's determinations to make the placement on their own waived any redress under the Act 264 process forever. This position means that the State would *never* accept full financial responsibility for the residential placement of Student, despite its Act 264 obligations, regardless of the number of years that the students may remain in the residential placement.

Both MVSU and Springfield seek an order compelling the State to compensate them for the unreimbursed expense of Student's residential placement *and* requiring the State to accept financial responsibility for that placement as long as it is necessary to comply with the IDEA. It also seeks a three-party declaratory judgment to the effect that the State's policies: (1) fail to comply with the requirements of the IDEA; (2) lack reasonable procedures for dealing with contested reimbursement requests; and (3) did not effectively permit any appeal regarding residential placement denial, at least in the circumstances of this case. The Schools frame their claims as seeking mandamus under Rule 75 procedure and declaratory relief.[7]

### E. The IDEA

Much of the Schools claims revolve around the Vermont's Interagency Agreement and the framework that is required and established by the IDEA for such agreements. This includes

---

[7] The complaints do not clearly frame the principal legal claim. In particular, the complaint refers to Rule 75 generally without further specifying what claim is being asserted. Rule 75 is not a claim: it is a procedure that applies to certain types of claims. In briefing, both schools clarify that they are seeking relief in the nature of mandamus. Mandamus typically is sought to compel the performance of a ministerial duty. See *Maple Run Unified Sch. Dist. v. Vermont Hum. Rts. Comm'n*, 2023 VT 63, ¶ 11, 218 Vt. 496. Insofar as each school complains in this case that the State's procedures failed to include a required and reasonable interagency funding dispute resolution process, it is fairly inferable that contemplates potential relief in this case might include an order compelling the State to undertake that process, even if the reimbursement sought might be determined to not be directly available here. The State's interpretation of the complaint to the contrary is cramped and unfair. See V.R.C.P. 8(e)(1) ("No technical forms of pleading . . . are required."), 8(f) ("All pleadings shall be so construed as to do substantial justice.").

the requirement under the IDEA to have a mechanism for resolving interagency funding disputes. The Vermont Interagency Agreement states that: "the agreement delineates the provision and funding of services required by federal or state law or assigned by state policy. The areas covered by this agreement include coordination of services, agency financial responsibility, conditions and terms of reimbursement, and resolution of interagency disputes." Interagency Agreement at 2. Among other things, it explains that a Case Review Committee of the State Interagency Team "meets regularly to review the recommendations of service coordination teams for intensive services including residential care and high-level wrap-around services. The purpose of the review is to determine if a child's needs require the proposed level of service." *Id*. at 5. The Agreement emphasizes that the AOE "will work with [local education agencies] to maximize receipt of federal Medicaid dollars [presumably a reference to the Act 264 process] available for reimbursement of medically related services provided to Medicaid-eligible students." *Id*. at 12. It goes on:

> If a non-educational agency fails to provide or pay for services for which they are responsible and which are also considered special education and related services, the [local education agency] (or state agency responsible for developing the child's [individualized educational program]) *shall provide or pay for these services to the child in a timely manner. The [local education agency] or state agency may then claim reimbursement for the services from the non-educational agency* that was responsible for the provision of the services and failed to provide or pay for these services and that agency shall reimburse the [local education agency] or state agency in accordance with the terms of this agreement.
>
> Pursuant to this provision, the AHS and DOE will develop joint procedures for reimbursement.

*Id*. at 12–13 (emphasis added). The Agreement includes this dispute resolution process:

> Where the [local interagency team] is unable to resolve any of the issues pursuant to this agreement, a referral may be made to the [state interagency team] for resolution.

Where the [state interagency team] is unable to resolve a dispute among the various agencies, it shall inform all participating parties of the right to an appeal process. The Secretary of AHS and Commissioner of DOE may resolve the issues and render a written decision or may arrange for a hearing pursuant to Chapter 25 of Title 3 [Vermont's Administrative Procedures Act].

If a hearing is held, it shall be conducted by a hearing officer appointed by the Secretary of the AHS and the Commissioner of Education. The Secretary and the Commissioner may affirm, reverse, or modify the proposals of the hearing officer.

Nothing in this agreement shall be construed to limit any existing substantive or procedural protections of state or federal law or regulations.

*Id*. at 13. The right to a hearing under the Administrative Procedures Act presumably recognizes that any such dispute would present a formal contested case. See 3 V.S.A. § 801(b)(2) (defining contested case to mean "a proceeding, including but not restricted to rate-making and licensing, in which the legal rights, duties, or privileges of a party are required by law to be determined by an agency after an opportunity for hearing"); 3 V.S.A. §§ 809–816 (contested case procedures).

The form promulgated by AOE and AHS for coordinated services plans explains what it is as follows: "A Coordinated Services Plan is a written plan developed by a team for a child/youth who requires services from more than one agency. It is designed to meet the needs of the child within his or her family or in an out-of-home placement, and in the school and the community." See https://ifs.vermont.gov/docs/act264 ("This form is a joint resource of the Vermont Agency of Human Services and the Vermont Agency of Education."). This is the document that, in Student's case, reveals the local determination in favor of residential placement. A preprinted portion of the form provides as follows:

**A. Act 264 Appeal Process Regarding Coordination of Services**

A local agency, a service provider or a parent on the team may request an appeal concerning coordination among the agencies under Act 264 and related provisions of the Interagency Agreement.

An appeal is available if neither the Local Interagency Team nor the State Interagency Team is able to resolve the dispute. The [State Interagency Team] shall inform the local agency, service provider(s) and parent(s) of their right to an appeal and provide the name and address for submitting the appeal.

The appeal process shall consist of a hearing pursuant to Chapter 25 of Title 3 [Vermont Administrative Procedures Act]. The hearing shall be conducted by a hearing officer appointed by the Secretary of the Agency of Human Services and the Secretary of Education. Based on evidence presented at the hearing, the hearing officer shall issue written findings and proposals for decision to the Secretary and the Commissioner. The AHS and AOE Secretaries may affirm, reverse, or modify the proposals for decision. All parties shall receive a written final decision by the Secretaries.

**B. Appeal Process Regarding Issues of Payment and Reimbursement between Agencies**

When a non-education agency fails to provide or pay for services for which they are responsible, and which are also considered special education and related services, the school district (or state agency responsible for developing the child's Individualized Education Plan . . .) shall provide or pay for these services to the child in a timely manner. The school district (or state agency responsible as the education agency) may then claim reimbursement for the services from the non-education agency that was responsible and failed to provide or pay for these services. The procedures outlined in the Interagency Agreement of June 2005 shall be used for reimbursement claims between agencies.

Student's Case Management Plan at 19. The language on the form is generally consistent with the Interagency Agreement. Along with no timely notice of the denial for lack of medical necessity, no one ever advised MVSU or Springfield of any right to appeal.

*F. Post-January 11, 2023 Process*

After the January 11, 2023, letters from State representatives to MVSU and Springfield explaining that the HCRS at some point had determined that there was no medical necessity supporting residential placement, despite the lack of notice as to appeal rights, MVSU, through

counsel, and Springfield, separately, attempted to appeal on February 17, 2023. Counsel for MVSU wrote:

> . . . [P]lease find attached their appeal of the denial by the State Interagency Team of their request under 20 U.S.C. §1412(12)(A) and Section III of the Interagency Agreement for reimbursement from the Medicaid-funded agencies for non-educational costs associated with the student's residential placement.

> Please advise whether further information is needed.

> Superintendent Sousa would be pleased to meet with you if it would be helpful in resolving this matter.

Superintendent Nichols, on behalf of Springfield wrote:

> On behalf of the Springfield School District, pursuant to Section III of the Interagency Agreement, I am appealing the January 11, 2023 decision of the State Interagency Team ("SIT"), denying our request for reimbursement of the non-educational portion of a student's out-of-district residential placement (attached).

> \* \* \*

> I would be happy to meet with the two of you at your earliest convenience to discuss this matter further.

> Thank you for your consideration.

No hearing or other process was scheduled or took place following receipt of these letters. On November 15, 2023, MVSU and Springfield, through counsel, renewed their requests for reimbursement in great detail and again requested a hearing. No hearing or other process was scheduled or took place.

11

On April 1, 2024, MVSU and Springfield again renewed its request for reimbursement in great detail and again requested a hearing. Again, no hearing or other process was scheduled or took place.

MVSU and Springfield filed their suits on May 16, 2024. Students continue to receive special education and related services in a residential placement. The State has never accepted full responsibility for the Students' residential placement, granted a hearing, or conducted any other process to determine whether MVSU or Springfield is entitled to reimbursement under Act 264 or whether the State should pay for the placements on at least a forward-looking basis. Its position appears to be                    that because MVSU and Springfield made the initial placement, MVSU and Springfield will remain responsible (for the maximum statutorily permitted amount) as long as the Students continue to need that placement regardless of their eligibility under Act 264 or the Interagency Agreement. The State assumes that, but nowhere explains why, a placement under Special Education Rule 2364.4.1 should operate as a permanent, irrevocable election by MVSU and Springfield to not pursue the Act 264 process.

### G. Motion to Dismiss Arguments

The State has filed a motion to dismiss, ostensibly under both Rule 12(b)(1) (lack of subject matter jurisdiction) and (6) (failure to state a claim). It argues that (1) each school lacks standing to assert its claims, (2) the complaint is untimely under Rule 75(c), (3) the court lacks subject matter jurisdiction over the mandamus claim because any obligations the State had or may have are entirely discretionary, (4) MVSU and Springfield failed to exhaust their administrative remedies, and (5) the claim for declaratory relief is not applicable.

## II. **Legal Analysis**

The State argues that (a) MVSU and Springfield lack standing to assert their claims, (b) the complaint is untimely under Rule 75(c), (c) the court lacks subject matter jurisdiction over the mandamus claim because any obligations the State had or may have are entirely discretionary, (d) MVSU and Springfield failed to exhaust their administrative remedies, and (e) because there is no subject matter jurisdiction over the mandamus claim, there can be no viable claim for declaratory relief.

12

A.    *Standing*

The State argues that MVSU and Springfield lack standing to pursue their claims in this case because (a) they have no cognizable injury and (b) even if they did, the State did not cause it.

"Standing doctrine is fundamentally rooted in respect for the separation of powers of the independent branches of government." *Hinesburg Sand & Gravel Co. v. State*, 166 Vt. 337, 341 (1997) (noting at 340–41 that "[o]ne of the 'passive virtues' of the standing doctrine is to promote judicial restraint by limiting the occasions for judicial intervention into the political process"). Standing "confin[es] the judiciary to the adjudication of actual disputes and prevent[s] the judiciary from presiding over broad-based policy questions that are properly resolved in the legislative arena." *Parker v. Town of Milton*, 169 Vt. 74, 77 (1998). A party's standing is not contingent on the merits of the claim being asserted; it must exist in order for the court to reach the merits. See 13A Wright & Miller, Fed. Prac. & Proc. Juris. § 3531 (3d ed.) ("The question whether the law recognizes the cause of action stated by a plaintiff is frequently transformed into inappropriate standing terms. The Supreme Court has stated succinctly that the cause-of-action question is not a question of standing.").

The contemporary federal doctrine was described in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), as follows:

> [T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Id*. at 560–61 (citations omitted). These are the constitutional (as opposed to prudential) limits on federal courts' jurisdiction.

13

The federal standing requirements have been adopted in Vermont. *Parker*, 169 Vt. at 77–78 (explaining that in *Hinesburg Sand & Gravel*, the Vermont Supreme Court adopted the standing test articulated in *Lujan*). Vermont courts are not, however, inflexibly bound by federal standing precedents insofar as standing in Vermont state court presents a legal question under the Vermont, rather than United States, constitution. See *Ferry v. City of Montpelier*, 2023 VT 4, ¶ 15, 217 Vt. 450, 461–62.

MVSU and Springfield plainly have standing to bring their claims in this case. The State argues that the complaint and its attachments describe no injury because MVSU and Springfield concede that the AOE has been paying for Student's residential placement all along (and presumably there is no anticipated risk of that changing). This argument simply ignores the injury being asserted by MVSU and Springfield, that funding through AOE rather than AHS (via Act 264) leaves it saddled with a substantial and increasing expense for which the State otherwise would be completely liable. The court fails to see how this substantial financial burden is not an injury for standing purposes.

The State further argues that, even if there is some injury, the State has nothing to do with it; there is no causation. In the State's view of the complaint, the sole claimed reason for the lack of Act 264 funding is that HCRS made a determination that there is no medical necessity for the placements. HCRS is, the State asserts, a completely independent third party having nothing to do with the State or its processes.

This argument lacks merit. First, the complaint fairly challenges in many respects the procedures and policies employed by the State, not HCRS, including those policies that permitted HCRS to make its determination without notice to MVSU or Springfield, without any effective ability to challenge the determination, and without any ability to resolve the interagency funding dispute after the Schools made the residential placement on their own—a decision compelled, at least superficially, by State and federal policies. Moreover, HCRS is by no means some officious interloper. The determination of medical necessity was a responsibility of the State that the State delegated to HCRS. This delegation of authority, and involvement of HCRS into what is fundamentally an administrative decision-making process, connects the resulting breach of process causally to the State.

14

The State also argues that, even if there is standing in this case, Secretary Saunders, Commissioner of the AOE, should be dismissed as a party because there is no allegation that AOE has failed to pay, in the statutorily required amounts, for Student's residential placement. In other words, there is no viable claim against her. Dismissal of Ms. Saunders is not warranted at this time.

First, Ms. Saunders, in her personal capacity, is not a party to this case. Both Secretaries have been sued in their official capacities only. The U.S. Supreme Court has explained the distinction between official and personal (or individual) capacity suits as follows:

> In an official-capacity claim, the relief sought is only nominally against the official and in fact is against the official's office and thus the [government entity] itself. This is why, when officials sued in their official capacities leave office, their successors automatically assume their role in the litigation. The real party in interest is the government entity, not the named official. "Personal-capacity suits, on the other hand, seek to impose individual liability upon a government officer for actions taken under color of state law." "[O]fficers sued in their personal capacity come to court as individuals," and the real party in interest is the individual, not the sovereign.

*Lewis v. Clarke*, 581 U.S. 155, 162–63 (2017) (citations omitted).; *accord Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("[T]he real party in interest in an official-capacity suit is the governmental entity and not the named official."); *Karcher v. May*, 484 U.S. 72, 78 (1987) ("We have repeatedly recognized that the real party in interest in an official-capacity suit is the entity represented and not the individual officeholder."); *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity." (citation omitted)).

The relevant defendant is the AOE, not Ms. Saunders, and the AOE is an entity of the State, just as the AHS is. Moreover, *both* AOE and AHS appear to have responsibility for the interagency processes and policies at issue in this case as well as how Student's residential placement is paid for. The Interagency Agreement itself expressly says that the AOE "will work

15

with [local education agencies] to maximize receipt of federal Medicaid dollars [presumably a reference to the Act 264 process] available for reimbursement of medically related services provided to Medicaid-eligible students." Interagency Agreement at 12. The Students are Medicaid-eligible and there is nothing in the present record to support an inference that AOE worked with the Schools to maximize receipt of federal Medicaid dollars. The implication in the complaint, which the Court must draw in favor of the Schools at this point in the litigation, is that AOE and AHS went out of their way to do the opposite. Therefore, the Court finds no basis for dismissing the AOE from this suit at this time.

B.     *Timeliness*

The State argues that MVSU's and Springfield's mandamus claims should be dismissed as untimely under V.R.C.P. 75(c). Rule 75(c), as relevant, provides that a mandamus claim "shall be filed within 30 days after notice of any action or refusal to act of which review is sought . . . and, in the event of a failure to act, within six months after expiration of the time in which action should reasonably have occurred." In the State's view, MVSU and Springfield clearly had notice that AHS was treating their Act 264 claims as denied no later than January 11, 2023, and neither party filed their cases until May 16, 2024, well after both 30-day and 6-month timeframes.

This argument may have some merit or operate to limit any lookback period on the State's liability if the mandamus claim ultimately is successful. The Court, however, declines to dismiss the claim outright now for two reasons. First, the administrative processes at work below, to the extent they appear in the record now, are vague and confusing. Presumably, there was a process or appeal that should have been available to the Schools, the record indicates that both MVSU and Springfield were trying to avail themselves of those avenues of relief while they attempted to pursue the Act 264 process. There is a reasonable implication in the attachments, which the Court must accept, that the State used opacity and delay to force MVSU and Springfield into making the placement on its own. As a result, the State has rested upon a resulting catch-22: that the placement necessarily and automatically terminated the Act 264 process. At a minimum, under these facts, it is possible that the Schools have an estoppel claim that would prevent the State from invoking the procedural timeframe at V.R.C.P. 75(c). See

16

*Fyles v. Schmidt*, 141 Vt. 419, 422 (1982) (noting that V.R.C.P. 75(c) is not jurisdictional and may be subject to estoppel for equitable reasons).

Moreover, the Students' residential placement, and how it is funded, is an ongoing matter. The expense to MVSU and Springfield continues to accrue as this litigation unfolds. The State treats the Schools' decisions to place the Students, pursuant to Special Education Rule 2364.4.1, as a permanent and irrevocable election by the Schools to not pursue the Act 264 process, which forever nullifies the State's responsibilities under Act 264. As far as the record illuminates, the State's contention in this regard is ipse dixit.[8] Thus far, the State has pointed to nothing that would require such dire consequences flowing from a onetime decision for a student placement that can be expected to continue. Thus, even if Rule 75(c) eventually might counsel in limiting how far back MVSU's and Springfield's claims may reach, it is not clear why every next request for some process from the State would not trigger a new timeframe for review.

C.  *Subject matter jurisdiction re mandamus*

The State argues that the court has no subject matter jurisdiction over MVSU's or Springfield's mandamus claims because any obligations the State had or may have are discretionary and not ministerial. In other words, according to the State, the court lacks subject matter jurisdiction because MVSU's and Springfield's claims fails on the merits.

The State's framing of the matter fundamentally misunderstands the difference between a court's jurisdiction and a claim's merits. As the U.S. Supreme Court definitively explained long ago:

> Jurisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover. For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction. Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy. If the court does later exercise its jurisdiction to determine that the allegations in the complaint do not

---

[8] Black's Law Dictionary, ipse dixit (12th ed. 2024) (in Latin, "he himself said it"; "Something asserted but not proved").

state a ground for relief, then dismissal of the case would be on the merits, not for want of jurisdiction.

*Bell v. Hood*, 327 U.S. 678, 682 (1946).  In other words, jurisdiction and the merits are separate matters; the Court must have jurisdiction to reach the merits.  Conversely, a showing that a claim lacks merit says nothing on its own about the Court's jurisdiction.  A Court may have jurisdiction regardless that the claim lacks merit.

The Seventh Circuit Court of Appeals has explained exactly that in the context of a mandamus claim as follows:

[I]t is necessary to distinguish between the court's power to adjudicate the petition and the court's authority to grant relief.  Only the former necessarily implicates the subject-matter jurisdiction of the court; the latter will depend on whether the statute on which the plaintiff is relying imposes a clear duty on the officer or employee of the United States [referring to the elements of a mandamus claim]. . . .  The Tenth Circuit recognized as much in [a 1981 case], in which it said:

*In resolving whether [subject matter] jurisdiction is present, allegations of the complaint, unless patently frivolous, are taken as true to avoid tackling the merits under the ruse of assessing jurisdiction . . . .*

.    .    .

We agree with the [Sixth Circuit] that unless the claim is so frivolous that it [may be dismissed for that reason], the district court has [subject matter] jurisdiction . . . to determine whether the prerequisites for mandamus relief have been satisfied: does the plaintiff have a clear right to the relief sought; does the defendant have a duty to perform the act in question; and is there no other adequate remedy available.  *A conclusion that any one of those prerequisites is missing should lead the district court to deny the petition, not because it now realizes that it had no power to be thinking about the case in the first place, but because the plaintiff has not demonstrated an entitlement to this form of extraordinary relief.*

18

*Ahmed v. Department of Homeland Security*, 328 F.3d 383, 387–87 (7th Cir. 2003) (emphasis added, citations omitted).

The State's argument conflates this distinction between subject matter jurisdiction and the merits. It improperly argues that the Court lacks subject matter jurisdiction *because* the claim fails on the merits. There can be no serious contention in this case that the Court lacks the power to consider the merits of MVSU's and Springfield's mandamus claims in the present circumstances. Framed properly, the State's argument is that the Schools' mandamus claims fail to state a claim for relief. Such an argument falls under Rule 12(b)(6), rather than Rule 12(b)(1), and the record for such review is limited to the four corners of the complaint and the attachments to it.[9] See *Housing Our Seniors in Vermont, Inc. v. Agency of Commerce & Community Development*, 2024 VT 12, ¶¶ 8–10 (discussing the different standards between dismissals under Rule 12(b)(1) and 12(b)(6)). A motion to dismiss for failure to state a claim faces a high bar. The Vermont Supreme Court has described the familiar standard for Rule 12(b)(6) motions to dismiss for failure to state a claim as follows:

> "A motion to dismiss . . . is not favored and rarely granted." This is especially true "when the asserted theory of liability is novel or extreme," as such cases "should be explored in the light of facts as developed by the evidence, and, generally, not dismissed before trial because of the mere novelty of the allegations." In reviewing a motion to dismiss, we consider whether, taking all of the nonmoving party's factual allegations as true, "'it appears beyond doubt' that there exist no facts or circumstances that would entitle the plaintiff to relief." We treat all reasonable inferences from the complaint as true, and we assume that the movant's contravening assertions are false.

*Alger v. Dep't of Labor & Indus.*, 2006 VT 115, ¶ 12, 181 Vt. 309, 316–17 (citations omitted); see also 5B A. Benjamin Spencer, et al., Fed. Prac. & Proc. Civ. § 1357 (4th ed.) ("Ultimately, the burden is on the moving party to prove that no legally cognizable claim for relief exists.").

---

[9] Both parties informally introduce new facts casually in their briefing that are outside the four corners of the complaint.

"A court can issue a writ of mandamus . . . only under certain circumstances: (1) the petitioner must have a clear and certain right to the action sought by the request for a writ; (2) the writ must be for the enforcement of ministerial duties, but not for review of the performance of official acts that involve the exercise of the official's judgment or discretion; and (3) there must be no other adequate remedy at law." *Petition of Fairchild*, 159 Vt. 125, 130 (1992); see also *Bargman v. Brewer*, 142 Vt. 367, 369 (1983) (noting that a ministerial act is one "regarding which nothing is left to discretion" (citation omitted)); *State v. Forte*, 159 Vt. 550, 555 (1993) (duty appropriate for mandamus must be "simple and definite") (citation omitted)).

"In exceptional cases, mandamus may be available to enforce a 'discretionary decision where a public official or body has engaged in an arbitrary abuse of power which amounts to a virtual refusal to act or to perform a duty imposed by law.' However, in 'each case where we have endorsed mandamus relief due to an arbitrary abuse of power, we have required that the alleged arbitrary abuse of discretion amount to a practical refusal to perform a certain and clear legal duty.'" *Office of the Auditor of Accounts v. Office of the Attorney General*, 2025 VT 36, ¶ 50 (citations omitted).

In all events, mandamus must be predicated on a "clear and certain right to the action sought by the request for a writ." See *Skiff v. South Burlington School District*, 2018 VT 117, ¶ 25, 208 Vt. 564 (residents' mandamus claim against school district improperly founded on nonexistent constitutional right); *Wool v. Menard*, 2018 VT 23, ¶ 18, 207 Vt. 25 (inmate's mandamus claim about competitive bidding properly predicated on statutory right to telephone services at "lowest reasonable cost"); *Petition of Fairchild*, 159 Vt. at 130 (adjacent landowners' mandamus claim against Town properly predicated on right to enforce relevant judicial decision and Town zoning regulations).

The State also argues that MVSU and Springfield are, in effect, seeking to challenge HCRS's determination that there is no medical necessity for Students' residential placement, which is fundamentally a discretionary decision, and that "AHS cannot have a ministerial duty to reimburse costs for which a finding of medical necessity was never made. Nor can it be said that AHS has arbitrarily refused to perform its duties where the Complaint clearly alleges that the DA did not support medical necessity and did not forward the matter to the Case Review Committee for review." The State's Motion to Dismiss at 13–14.

20

The Court does not understand or perceive a claim in this case by which MVSU or Springfield might seriously contemplate that the court will substitute its determination of medical necessity for HCRS's. The Schools' claims are focused on how the Act 264 process unfolded and then was terminated (prematurely, in their view), including the protracted delay, the lack of notice to the Schools, and the lack of any effective way to challenge unfavorable decisions or seek resolution of interagency disputes. The State's arguments in its motion address none of these issues.[10]

In Vermont, motions to dismiss are "'not favored and rarely granted.' This is especially true 'when the asserted theory of liability is novel or extreme,' as such cases 'should be explored in the light of facts as developed by the evidence, and, generally, not dismissed before trial because of mere novelty of the allegations.'" *Alger v. Dep't of Labor & Indus*., 2006 VT 115, ¶ 12, 181 Vt. 309 (citations omitted); see also *Colby v. Umbrella, Inc*., 2008 VT 20, ¶ 13, 184 Vt. 1 ("The complaint is a bare bones statement that merely provides the defendant with notice of the claims against it."); *Bock v. Gold*, 2008 VT 81, ¶ 4, 184 Vt. 575 ("the threshold a plaintiff must cross in order to meet our notice-pleading standard is 'exceedingly low'").

This is a textbook example of a case that will be better resolved once the evidence develops and the overlapping and complex provisions of IDEA, Medicaid regulations, Vermont law, and AOE and AHS policies and practices, as they may apply to what happened here, come better into focus.

> D.     *Exhaustion of administrative remedies*

---

[10] The court notes that the parties' positions in briefing, to some extent, have not always been easy to pin down and may have morphed over the course of their numerous dismissal filings. In particular, the State apparently maintains that the right to an administrative hearing in the Interagency Agreement is purely discretionary with the State (hence no mandamus relief could ever be appropriate), which by that account presumably would be free to completely ignore any such dispute and never grant a hearing, ostensibly rendering the entire dispute resolution process illusory at best. See the State's Sur-Reply in Further Support of the Motion to Dismiss at 2 (filed May 27, 2025). In its Supplemental Memorandum of Law in Further Support of the Motion to Dismiss at 4 (filed Aug. 19, 2025), however, the State instead maintains that "The crux of the problem with Plaintiff's requested relief is that there was never a request for a hearing pursuant to the [Interagency Agreement]. Thus, there is no factual basis on which the Court can determine whether Plaintiff was denied administrative review pursuant to the [Interagency Agreement] on the basis that [local education agencies] are not entitled to such review." The court simply notes that MVSU and Springfield repeatedly sought a hearing that the State maintains they should have requested but had no right to receive. And, other than silence, MVSU and Springfield were met only with the assertion that, while seeking a hearing, they had somehow waived any ability to seek it. As far as the pleadings go, the State *never* sought to resolve an interagency dispute as to the Act 264 process that plainly existed. Instead, it simply refused to engage with either MVSU or Springfield on the matter.

Finally, the State faults MVSU and Springfield for not exhausting their administrative remedies. As the Vermont Supreme Court has explained: "[W]hen administrative remedies are established by statute or regulation, a party must pursue, or 'exhaust,' all such remedies before turning to the courts for relief. This long-settled rule of judicial administration serves the dual purposes of protecting the authority of the administrative agency and promoting judicial efficiency. Therefore, where an agency has jurisdiction to decide an issue, a court will not interfere with the agency's decision-making unless and until all administrative remedies have been invoked." *Jordan v. State Agency of Transp.*, 166 Vt. 509, 511–12 (1997) (citations omitted).

The State's argument is predicated on a deeply contested foundational premise: that MVSU and Springfield, by making the placement on their own, voluntarily abandoned the Act 264 process. But, as far as the pleadings go, the principal stumbling block to the Act 264 process was the State's decision to not permit MVSU or Springfield to pursue placement, whether as an appeal or to resolve an interagency funding dispute, all over the Schools' persistent objections, and after neither the State nor HCRS gave MVSU or Springfield notice of the disputed medical necessity determination.

The court declines to dismiss based on the lack of exhaustion at this time. It is at least possible that the Act 264 process did not happen because the State chose to make unavailable, not because the Schools failed to pursue it. The duty to exhaust an administrative remedy presumes that there is some administrative process available to be exhausted.

Moreover, a party typically *must* exhaust available administrative remedies before filing suit *when expressly mandated by statute*. Where the statute does not include a clear requirement of exhaustion, "sound judicial discretion governs." *Mullinnex v. Menard*, 2020 VT 33, ¶ 13, 212 Vt. 432 (quotations omitted). No relevant statutory exhaustion requirement has been brought to the court's attention. "[E]xhaustion of administrative remedies is a presumed requirement, and the burden is on the party seeking to bypass the administrative process to show that it fits within an exception to this general rule." *Id*., ¶ 14 (quoting *Luck Bros., Inc. v. Agency of Transp.*, 2014 VT 59, ¶ 20, 196 Vt. 584).

In this case, if the administrative process was available at all, it is at least possible that MVSU and Springfield could be entitled to have bypassed it due to evident futility.  See generally 4 Admin. L. & Prac. § 12:21 (3d ed.) ("These institutional interests [in enforcing exhaustion] may be overcome by a litigant's interest in prompt judicial review where (a) requiring exhaustion would cause undue prejudice, (b) doubt exists as to the power of the agency to grant effective relief; or (c) the agency 'is shown to be biased or has otherwise predetermined the issue before it.'  More broadly, exhaustion will be excused on a strong enough showing of 'futility.'") (footnote omitted)).

E.    *Declaratory Relief*

MVSU and Springfield seek a declaratory judgment to the effect that the State's policies fail to comply with the requirements of the IDEA, lack reasonable procedures for dealing with contested reimbursement requests, are inadequate, and do not effectively permit any appeal regarding residential placement denial.  The State argues that this claim should be dismissed because, in substance, it overlaps with the mandamus claim for which there is no jurisdiction, and a claim for declaratory relief cannot on its own expand the jurisdiction of the court.  See *McGlynn v. Town of Woodbury*, 148 Vt. 340, 343 (1987) ("Vermont's Declaratory Judgments Act, 12 V.S.A. §§ 4711–4725, does not enlarge the subject matter jurisdiction of the courts.").  Since the Court has not concluded that it lacks jurisdiction over the Schools' mandamus claim, this argument lacks sufficient basis at this time.  The Court need not consider the matter further at this time.

**Order**

For the foregoing reasons, the State's motion to dismiss in both cases is **Denied**.

Electronically signed on 2/5/2026 2:56 AM pursuant to V.R.E.F. 9(d)

_____
Daniel Richardson
Superior Court Judge